UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-173-02 (PJS/DTS)

UNITED STATES OF AMERICA,

Plaintiff,

v.

GISELA CASTRO MEDINA,

Defendant.

**GOVERNMENT'S POSITION
WITH RESPECT TO
SENTENCING**

**REDACTED**

The United States of America, by and through undersigned counsel, hereby submits its position with respect to sentencing of Defendant Gisela Castro Medina. For the reasons set forth below, the Government recommends a seven-year sentence of imprisonment, to be followed by five years of supervised release, and restitution, as a sentence that is sufficient but not greater than necessary to comport with sentencing goals.

Castro Medina played a crucial and despicable role in trafficking 15- and 16-year-old girls for her co-defendant, Anton Joseph Lazzaro. Being similar in age to these victims, Castro Medina was an effective recruiter. She could translate Lazzaro's "cringy," dated, and money-focused texts into cool invitations that made going to Lazzaro's condo seem fun, safe, and exciting. Castro Medina, however, served the girls up to a predator. Lazzaro lured the victims in, listening to their troubles, plying them with alcohol, having assembly-line sex with them, and then sent them off with a handful

of hundred dollar bills and occasionally vapes or another item of value. The victims' lives have been forever changed.

What made Castro Medina so successful as a recruiter is that she was the kind of girl Lazzaro was looking for. She was a "broken girl." Castro Medina's upbringing is sad but not surprising. She was a victim of abuse and Lazzaro became the father-figure she never had. But while he showered her with wealth for her successful recruiting efforts, he also isolated her, abused her, and exploited her.

Castro Medina was rightfully charged for her role in sex trafficking minors. Castro Medina has continued to gain insight into the role she played for Lazzaro since her arrest. She has thrived while on supervision. She is now sober. She is getting mental health treatment. She is attending school and working toward her goal of a professional career. She pled guilty. She met with the Government and told them the good, the bad, and the ugly about her conduct and the commission of these offenses. And, as this Court saw, Castro Medina came in and told the jury what happened and what she did. For that, Castro Medina is deserving of significant consideration for her substantial assistance.

As this the Court saw at trial, Castro Medina can be charming, smart, funny, calculating, vulnerable, unsophisticated, worldly, and manipulative. Arriving at a fair and just sentence is difficult. From a certain lens, no sentence (even one within the Guidelines range) can put the victims back where they would have been had they never met Castro Medina and Lazzaro. From a different one, Castro Medina comes from a

background and circumstances worthy of significant mitigation and has done all that has been asked of her since her arrest. After balancing these competing portraits, the Government recommends a sentence of seven years' imprisonment.

## RELEVANT FACTS

The United States agrees with and incorporates by reference the facts from the Offense Conduct section of the presentence report ("PSR," ECF No. 422 at ¶¶ 9–41), as well as the factual basis from the Plea Agreement (ECF No. 272 at ¶ 2).

## I.    OFFENSE CONDUCT

From May to December of 2020, Castro Medina conspired with her co-defendant, Anton Joseph Lazzaro, who she called "Tony," to engage in the sex-trafficking of minors, in violation of 18 U.S.C. § 1591. Castro Medina was 18 years old and just completing high school at the time she met Lazzaro in May 2020. Over the course of the next year, Lazzaro rewarded Castro Medina with more than $50,000 for her efforts in finding new girls for Lazzaro to have sex with. These victims included the five brave teenagers who testified before the Court at Lazzaro's trial. As detailed in their testimony and victim impact statements, Lazzaro's actions in trafficking these high school students for his own sexual gratification has left deep emotional scars that, for some, changed the course of their lives. Had the victims not met Castro Medina, they would not have suffered this trauma from Lazzaro. To achieve justice for these victims and deter others from engaging in this type of sexual exploitation, the Government recommends a seven-year sentence for Castro Medina.

<u>**Victim A**</u>

Sixteen-year-old Victim A was friends with eighteen-year-old Castro Medina long before either of them met Lazzaro. Tr. Vol. IV at 787–88. Castro Medina, who experienced difficulties at home (PSR ¶¶ 100–03), was welcomed into Victim A's family, even celebrating holidays with them (PSR ¶ 46, p.14). At the time she and Victim A met Lazzaro, Castro Medina considered Victim A to be her best friend. Tr. Vol. II at 272.

In the spring of 2020, Victim A was living in Duluth and attending outpatient treatment for substance abuse, but having trouble getting along with her family. Tr. Vol. IV at 787. Castro Medina showed up and removed Victim A from her family to where Castro Medina was living in Loretto, Minnesota. *Id.* at 787–88. In May 2020, the girls each created a profile on Seeking Arrangement, a "sugar daddy" website. *Id.* at 788. Castro Medina connected with Lazzaro on Seeking Arrangement and soon began texting with him on Snapchat, a messaging application. *Id.* at 790. Lazzaro asked for a selfie while Castro Medina was in the car with Victim A, so the two girls sent him a picture. *Id.* In return, Lazzaro sent Castro Medina $50, for cheeseburgers, setting a transactional tone to the relationship from the outset. Tr. Vol. II at 276 (Castro Medina testifying that Lazzaro "said he would give us money for food *in exchange for* a picture of our faces" (emphasis added)).

Lazzaro then invited Castro Medina to his condo in downtown Minneapolis. Castro Medina asked "if it was okay for [her] to bring [her] 16-year-old friend [(Victim

A)] along. And [Lazzaro] said it was perfectly fine." *Id.* Lazzaro ordered an Uber to bring the girls from Castro Medina's grandmother's home in Maple Plain to the Hotel Ivy in downtown Minneapolis on May 13, 2020. Gov. Ex. P-1. During that first visit, Victim A told Lazzaro that she had just gotten out of a residential treatment program for mental health and substance abuse issues. Tr. Vol. IV at 794. Lazzaro's response to that information was to pour the girls shots of vodka and give them champagne. *Id.* As the girls became intoxicated, Lazzaro pulled out "stacks" of cash and shared the menu of sex acts that the girls could perform to get paid. *Id.* at 797. Victim A and Castro Medina declined to kiss each other for money on that night, but Victim A did agree to take her top off. *Id.*; Tr. Vol. II at 286. Lazzaro then had sex with both Victim A and Castro Medina, and paid them in hundred dollar bills. Tr. Vol. IV at 798.

After leaving Lazzaro's condo in the car he ordered for them, Castro Medina asked Victim A, "why didn't we get that stack?," referring to the stack of bills that Lazzaro had shown the girls. Gov. Ex. A-8; Tr. Vol. II at 319. Victim A responded that it was because the girls "didn't make out" with each other as Lazzaro had requested. Gov. Ex. A-8. Castro Medina expressed disappointment, *id.*, and when the girls returned to the condo on May 15, 2020, the girls made out with one another to get more money. Tr. Vol. IV at 802. Lazzaro videotaped the kiss as he cheered, "There we go!" in the background, clearly a fan of what he was purchasing. Gov. Ex. A-12.

Once again, Lazzaro provided the girls with enough alcohol that they lost full control of their faculties and, only then, proceeded to have sex with both of them. Tr.

Vol. II at 309; Tr. Vol. IV at 800–01. Castro Medina testified that she became so drunk that she was drifting in and out of consciousness. Tr. Vol. II at 309. She remembers being curled up on the edge of the bed in a fetal position when Lazzaro "called [her] into the mix" to have sex with her. *Id.* at 308. Victim A recalls that Castro Medina was "completely unconscious" and "had no idea what was going on." Tr. Vol. IV at 801. Victim A tried to stop Lazzaro, telling him that he could not have sex with someone who was unconscious. *Id.*

### Becoming Lazzaro's Recruiter

The second time that Castro Medina and Victim A had sex with Lazzaro, he pulled Castro Medina aside and suggested that Castro Medina become his recruiter. Tr. Vol. II at 310, 326. Lazzaro explained that Castro Medina would act as a "matchmaker" for him, and that he had someone in California perform this role for him in the past. *Id.* at 311. The conversation stalled as Victim A returned from the bathroom and was not brought up again until later in May. *Id.* at 326.

At that time, Lazzaro and Castro Medina attempted to go to CoV, a restaurant in Wayzata. *Id.* at 326–27. Finding the restaurant to be closed due to the pandemic, the two got take-out and ate in Lazzaro's Cadillac. *Id.* at 327. Lazzaro brought up the idea of Castro Medina being his recruiter and assured her that such activities were "okay." *Id.* Castro Medina testified: "He said it's really simple. It's really easy to do. That all I have to do is like message someone, and he crafted up a little message." *Id.*

Castro Medina understood from this conversation that she would be paid for acting as a recruiter. *Id.* at 331–32.

Lazzaro made clear to Castro Medina that he preferred girls who were sixteen years old, white, without tattoos, and very thin. *Id.* at 332. "He preferred what he calls broken girls, sluts, whores." *Id.* Castro Medina delivered.

Victim A became Castro Medina's first find. Victim A returned to Lazzaro's apartment alone on other occasions through the late spring of 2020. On each of these trips, Victim A had sex with Lazzaro and received payment in the form of money that she was to give to Castro Medina, solidifying Castro Medina's role as Lazzaro's recruiter. Tr. Vol. IV at 806, 810. Castro Medina seemed to embrace this role. In a Snapchat exchange with a friend, Castro Medina explained that Victim A had sex with Lazzaro "and he sent an envelope w[ith] money for me to her / and i wasn't even there / does that make me a pimp?" Gov. Ex. 10. And in Government Exhibit G-9, jurors saw a video that Castro Medina made in which she thumbs through $100 bills over a bottle of champagne—gifts from Lazzaro via Victim A. Gov. Ex. G-9; Tr. Vol. II at 362. In the background of the video, the song "Pimp" plays. Tr. Vol. II at 363.

### Victim B and T.L.

Castro Medina also enlisted others to recruit girls for Lazzaro. *See id.* at 401 (Castro Medina admitting that she asked her friend A.J. to assist her with recruiting). In the spring of 2020, Victim B and her older sister T.L. were recruited to have sex with Lazzaro in exchange for money by a male friend (a minor at the time) who was also

friends with Castro Medina. Tr. Vol. II at 344, 371. Castro Medina had been tutoring this male friend, who was a high school student, and paid him money to recruit high-school girls looking for a sugar daddy. *Id.* at 348–49; Gov. Ex. G-22. At Castro Medina's urging, the male friend reached out to 18-year-old T.L. and asked if she would like to make money from a sugar daddy. Tr. Vol. III at 605–06. T.L. understood that being a "sugar baby" would involve sex acts for money, and said yes because she was not working at the time. *Id.* at 606.

T.L. then communicated with Lazzaro on Snapchat. Lazzaro invited T.L. to his condo for the first time in June 2020, Gov. Ex. B-5, and she went with her younger sister, Victim B, and a friend. Thinking that they would make more money if Lazzaro believed they were all adults, Victim B initially lied about her age, saying she was 18 years old. Tr. Vol. III at 615, 682. Later on that night, though, Victim B told Lazzaro her true age: 16 years old. *Id.* at 683. Once he knew how young Victim B was, Lazzaro began "coming on" to Victim B more than T.L. *Id.* On that first visit, after consuming a substantial amount of hard alcohol, T.L. had sex with Lazzaro and was paid several hundred dollars.

Victim B and T.L. returned to Lazzaro's condo. In addition to cash, Lazzaro ordered the sisters hundreds of dollars' worth of cosmetics and perfume from Sephora, which would be available at his condo when they returned the next time. *Id.* at 704; Gov. Ex. B-12, B-13.

On another trip to Lazzaro's condo, a different friend accompanied T.L. and Victim B.  The girls wore lingerie underneath their clothes, and Lazzaro offered them $100 per item of clothing that the girls would remove.  Tr. Vol. III at 686–87.  Lazzaro filmed the girls dancing in their lingerie, and a bill can clearly be seen sticking out of one of the girl's underwear.  Gov. Ex. N-24.  Lazzaro then escorted all three girls to his bedroom where he lined them up facedown on the bed and took a picture of the barely-clothed girls.  Tr. Vol. III at 690, 692–93; Gov. Ex. N-23, N-27.  Lazzaro distributed this photograph to other people, including Castro Medina, who described the girls who "were like lined up like sardines."  Tr. Vol. II at 349.

Victim B described for the jury how Lazzaro then proceeded to "fuck my sister, and then after that, he'd fuck me, and then he would fuck [their friend].  Just kind of one by one."  Tr. Vol. III at 693.  But as Lazzaro was beginning to have sex with the friend, she "got kind of uncomfortable, didn't like what was going on, so she kind of got up right away and ran out of the room really fast."  *Id.* at 694.  As she left, Lazzaro told her, "if you're not going to stay, you're not going to get paid."  *Id.* at 695, 637.  Victim B followed her friend out of the room and then tried to get her sister to leave as well.  *Id.* at 695–96.  Lazzaro became upset and threw Victim B out of the condo.  *Id.* T.L. stayed and had sex with Lazzaro.  *Id.*  Lazzaro paid T.L. and Victim B—who had sex with him—but did not pay their friend.  *Id.* at 636–37.

<u>**Victim C**</u>

In the spring of 2020, Castro Medina reached out to Victim C on Snapchat, and then met with her in person. Tr. Vol. I at 155. Victim C bonded with Castro Medina over Victim C's recent break up with her boyfriend. *Id.* at 160–64. Castro Medina exploited that bond and introduced Victim C to Lazzaro. Castro Medina told Victim C that Lazzaro thought Victim C was cute, that he was rich, and that he paid girls to come to his house to "drink and have fun." *Id.* at 166–67. Castro Medina put Lazzaro and Victim C in direct contact on Snapchat. *Id.* at 171. Victim C was 15 years old at the time and her Snapchat profile username included her birth year—2005. *Id.* at 155, 235. Lazzaro was nearly twice Victim C's age. But Castro Medina assisted Lazzaro in drafting a message to Victim C, massaging his "cringy" language that belied the age difference between Lazzaro and Victim C. Tr. Vol. II at 328.

Chatting with Lazzaro (through Castro Medina) over Snapchat, Lazzaro arranged for Victim C and several of her friends, ages 14 and 15 years old, to travel to Lazzaro's condo from their slumber party to meet him. Tr. Vol. I at 171. On August 9, 2020, Victim C was at a friend's house having a slumber party with three other girls. *Id.* Lazzaro sent a car to pick up Victim C and two of the other girls to bring them to the Hotel Ivy. *Id.* at 172; Gov. Ex. N-20. Victim C and her friends "were so fascinated" and "a little bit in awe" at the opulence on display in Lazzaro's residence. Tr. Vol. I at 179. Victim C recalls merely talking with Lazzaro that night. *Id.* at 189, 193. But her friend M.E. remembers a far more disturbing and heartbreaking series of events.

Victim C testified that she thought she drank only champagne that night. *Id.* at 197. But M.E. said that the girls all drank a liquor that "was like clear and it had gold flakes in it." Tr. Vol. III at 560. As this Court recalls, photographs capturing Lazzaro's bar area depict a bottle of Goldschläger on the second shelf from the top. Gov. Ex. J-8. According to the company's website, Goldschläger is a an "87-proof cinnamon shot made with real gold flakes." https://goldschlager.com/ (last visited July 23, 2023). M.E. recalls that Victim C left the living room with Lazzaro at one point in time. Tr. Vol. III at 561. Later, Victim C stumbled out of Lazzaro's bedroom and faceplanted on the living room floor with her pants and underwear around her ankles. *Id.* at 561–62. M.E. and another friend had to help Victim C off the floor. *Id.* at 562. Lazzaro paid the three girls that came $100 each. He gave them an additional $200 for their friends who did not come and suggested that they should return. He then arranged for an Uber to take them back to the slumber party so they wouldn't be missed.

Digital data collected in this case shows that Victim C went to Lazzaro's condo on multiple occasions, sometimes with friends and sometimes on her own. *See* Gov. Ex. N-28 (showing 15-year-old C.B. in Lazzaro's bedroom with Victim C on August 11, 2020); Gov. Ex. C-20 (showing Victim C in Lazzaro's bathroom saying that she is too drunk to stand on August 19, 2020).

Victim C provided detailed testimony about two other incidents with Lazzaro. On August 18 and into August 19, 2020, Victim C and C.B. went to Lazzaro's condo together after Lazzaro ordered a car to drive them from a friend's house in the area

near St. Michael.  Tr. Vol. I at 204.  Lazzaro served the 15-year-olds shots of Everclear. *Id.* at 205.  The girls quickly became more inebriated than they expected and had difficulty standing.  *Id.* at 206; Gov. Ex. C-20.  Lazzaro seized on this opportunity to suggest that Victim C "lay down in his room," and he accompanied her there.  Tr. Vol. I at 206.  Lazzaro began a sexually-focused game of truth or dare with the 15-year-olds. *Id.* at 207.  Lazzaro dared the girls to let him send a Snapchat of the two of them in his bed to a friend.  *Id.* at 208; Gov. Ex. N-28.

Lazzaro dared and then, as he had with Victim A and Castro Medina, paid the friends to kiss each other.  Tr. Vol. I at 207.  C.B. became uncomfortable and left the room.  Victim C remained on the bed.  In light of how much hard alcohol she drank, she was unable to control her body.  While she was in this state of near-paralysis, Lazzaro rolled Victim C onto her back so that he could have sex with her.  *Id.* at 210. Victim C told the jury, "I wanted to get up or do something about it, but I couldn't really do anything about it, even though I wanted to get up or stop it or something." *Id.* After he had sex with this 15-year-old girl who could not move, Lazzaro gave Victim C cash payment for the sex and some food from McDonald's and emergency contraception for the ride home.  *Id.* at 211.

After this experience, Lazzaro wanted C.B. to return to the condo alone, but Victim C was understandably worried about what Lazzaro might do to her friend, so she volunteered to go instead.  *Id.* at 214.  Lazzaro picked up Victim C from a park near C.B.'s house in his Ferrari.  *Id.* at 214–15.  Victim C recalled drinking Everclear again

and becoming drunk enough that she "couldn't really function." *Id.* at 216. Lazzaro again had sex with Victim C and drove her home the following morning with more cash and emergency contraception. *Id.* at 217. Victim C told the jury, "Looking back, I wish I never met Gisela. I wish none of it happened. I wish—I wish it never happened." *Id.* at 222.

### Victims D & E

Late in the summer of 2020, 16-year-old Victim E received a Snapchat message from Castro Medina, saying that Castro Medina's "sugar daddy" thought Victim E was cute. Tr. Vol. IV at 904. Castro Medina manipulated Victim E, telling her that Lazzaro was not "creepy" and sent Victim E pictures of money and alcohol that Lazzaro had given to her. *Id.* at 905. Soon Victim E was connected with Lazzaro on Snapchat and the topic of money came up fairly quickly in their communication. *Id.* at 909. Victim E agreed to meet with Lazzaro at the Mall of America. There, Lazzaro purchased Victim E an expensive Prada purse and invited her to come back to his place. *Id.* at 916. Victim E declined that time but returned at a later date with her friend Victim D. Victim E had asked her friend Victim D to serve as her "spy" in the Prada store to make sure that Victim E stayed safe during her first meeting with Lazzaro. Victim E understood that if she returned, she would likely get more stuff but she would probably have to engage in sex to get money. *Id.* at 931.

Approximately a month after Victim E declined Lazzaro's invitation to his condo, her friend and classmate, 16-year-old Victim D, suggested that the girls consider

reaching out to Lazzaro. *Id.* at 922. Victim D contacted Lazzaro and both girls were invited to the Hotel Ivy. *Id.* at 992. Like Victim E, Victim D believed they would get money, but only if they had sex with Lazzaro. *Id.* at 992.

A friend drove the girls to the Hotel Ivy. *Id.* The girls asked for Tony in 1920 and the desk clerk granted them access to Lazzaro's condominium. *Id.* at 994. Upon meeting Lazzaro, Victim D believed him to be "[w]ealthy" and "powerful." *Id.* at 995. Lazzaro offered the girls alcohol, but they declined. *Id.* at 996. The girls told Lazzaro that they were juniors in high school and only 16 years old. *Id.* at 997, 998. Once again, Lazzaro asked the two girls to kiss one another, but they declined "because [they] were best friends." *Id.* at 998. Both girls performed oral sex on Lazzaro, and then Lazzaro had vaginal sex with Victim D. *Id.* at 937, 999. While having sex with them, Lazzaro repeatedly referred to them as "good girls." *Id.* at 938. Afterwards, Lazzaro gave hundreds of dollars in cash to Victim E and gave Victim D hundreds of dollars in cash and a brand-new iPhone. *Id.* at 938, 1000. Lazzaro also gave both girls handfuls of flavored Puff Bar disposable vaping pens on their way out the door. *Id.*

At the end of September, Victim E returned to the Hotel Ivy on her own. *Id.* at 942, 944. Victim E explained to the jury that "it was collectively known that, like what I was there for . . . [a]nd so we moved pretty quick to his room where I had sex with him." *Id.* at 942. Victim E received more cash for having sex with Lazzaro. *Id.*

In October 2020, Victim D also returned to the Hotel Ivy alone and had sex with Lazzaro. *Id.* at 1007. Victim D told the jury that, on this occasion, Lazzaro had gotten

new bedding and asked Victim D to make the bed for him. *Id.* at 1009. Victim D explained, "I felt like I was playing a role or something. I felt kind of like I was in a porno." *Id.* at 1010. While Victim D was bent over making the bed, Lazzaro "began to touch [her] and then have sex with [her]." *Id.* When it was over, Lazzaro paid her cash. *Id.* Victim D noted however, that "after Tony" she "was a completely different person." *Id.* at 1013.

Victim D's mother, Sally, became suspicious, noticing expensive purchases that Victim D made and changes in her grades and attitude. *Id.* at 975–76. Sally described these changes to the jury: "So in addition to her grades falling, she started to like isolate herself. And she was such a social person and her friends were so important to her, but she just started to spend a lot of time in her room," *id.* at 982, where Victim D was drinking alcohol to numb the pain. Through some sleuthing, and with the help of an anti-trafficking organization, Source Minnesota, Sally learned what was going on. As she told the jury, "I was horrified. I don't even have words to describe how—I had all kinds of emotions. I couldn't believe that someone would do that to my daughter and lure her in that way." Tr. Vol. IV at 981.

Sally eventually called the FBI and a joint investigation with the Minnesota Bureau of Criminal Apprehension started in late October.

## II. BENEFITS CASTRO MEDINA RECEIVED FOR BEING LAZZARO'S RECRUITER

FBI Supervisory Forensic Accountant Mark Danielson testified at trial as to the staggering amount of benefits that Castro Medina received from Lazzaro over the

course of the year that they knew each other. Tr. Vol. V at 760–72. Through bank records, the Government traced $51,152.48 in cash and goods from Lazzaro to Castro Medina. Gov. Ex. O-1. Additionally, Castro Medina testified as to a number of additional items that she received from Lazzaro that were not reflected in these bank records. Gov. Ex. O-3. These items totaled more than $28,000. In total, then, from May 2020 through August 2021, Lazzaro paid Castro Medina nearly $80,000 in cash and other benefits for her work in finding girls under the age of 18 who would engage in commercial sex with Lazzaro.

### III. OBSTRUCTION INVOLVING VICTIM C

In addition to conspiring to traffic the five named victims in this case, Castro Medina also obstructed justice with respect to Victim C. In October 2020 Lazzaro went, and on March 2021, Lazzaro sent Castro Medina to Victim C with money and alcohol and instructed Castro Medina to tell Victim C that Lazzaro had "very good lawyers." *See* PSR ¶ 32; ECF No. 76 at 8. Castro Medina did so after Victim C expressed concern that Lazzaro had stopped messaging her and may not like her anymore. Gov. Ex. N-12. Castro Medina exploited these feelings and made sure that Victim C would not do anything to hurt Lazzaro, while making fun of Victim C's crush behind her back.

### IV. COOPERATION AGAINST LAZZARO

On August 11, 2021, a federal grand jury returned a 10-count indictment against Lazzaro, with seven of those counts also naming Castro Medina as a co-defendant. The

charges against Castro Medina were: conspiracy to commit sex trafficking of minors (Count 1), in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), (c), and 1594(c); sex trafficking of a minor (Counts 2, 3, 4, and 6) and attempted sex trafficking of a minor (Count 7), in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), (c), and 1594(a); and sex trafficking—obstruction (Count 10), in violation of 18 U.S.C. § 1591(d). Castro Medina was arrested in Florida on August 12, 2021, after she attempted to board a plane back to Minnesota while intoxicated. *See* Tr. Vol. II at 433, 491. Shortly after arriving back in Minnesota, Castro Medina elected not to file any pretrial motions and informed the Government, through her attorneys, that she was willing to assist in the investigation and prosecution of Lazzaro.

Castro Medina met with the Government on numerous occasions to provide information and walk through the large amount of digital evidence that was collected in this case. *See* Tr. Vol. II at 488. She provided the Government with access to her own digital devices and shared social media usernames known to belong to Lazzaro. Castro Medina also shared the names of those she had attempted to recruit on Lazzaro's behalf, allowing the Government to investigate other potential co-conspirators and victims.

Castro Medina was also forthright with the Government when, on more than one occasion, she received anonymous cash gifts of thousands of dollars. Castro Medina worked with her attorneys to ensure that this money was properly deposited in a way that it would be available to the victims for restitution payments.

Many of these meetings occurred before the parties had negotiated a plea agreement. On December 19, 2022, Castro Medina ultimately pleaded guilty to Count 1, conspiracy to commit sex trafficking of minors, and Count 10, the obstruction of the sex-trafficking investigation involving Victim C. ECF No. 262. As set forth in the plea agreement, the sentencing guidelines anticipated a range of lifetime imprisonment. On March 23, 2023, Castro Medina offered a full day's worth of testimony in the Government's case against Lazzaro. Castro Medina truthfully answered every question put to her, regardless of whether the answer cast her in a favorable light.

## ARGUMENT

### I.    THE U.S. SENTENCING GUIDELINES CALCULATIONS

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[U]nder the advisory guidelines scheme, sentencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006). The United States largely agrees with the calculation as presented in the Presentence Report.

In this case, the appropriate base offense level is 42. PSR ¶ 88. The appropriate criminal history category is I. PSR ¶ 96. Castro Medina's total offense level of 42 and criminal history category I results in an advisory sentencing guidelines range of 360 months to imprisonment for life. PSR ¶ 143. On Count 1, conspiracy to commit sex trafficking of minors, there is no minimum term of imprisonment up to life

imprisonment.  PSR F.1.  On Count 10, sex trafficking obstruction, there is no minimum term of imprisonment up to 25 years of imprisonment.  PSR F.1.

## A.     Calculation of the Guidelines

The base offense level for sex trafficking a minor is 30. PSR ¶¶ 52, 59, 66, 73. Two specific offense characteristics were found to apply to all victims. First, Castro Medina and Lazzaro used a computer or interactive service to entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with a minor, so the base offense level is increased by another 2 levels.  PSR ¶¶ 53, 60, 67, 74.  Lazzaro met victim Gabbie and Castro Medina through the "sugar daddy" website, Seeking Arrangement. As the recruiter, Castro Medina used Snapchat to send photos of Lazzaro and recruiting messages to girls.  In addition, apps such as Uber, Lyft, Venmo, and others were used to facilitate the sex trafficking.

Second, the offense involved the commission of a sex act or sexual conduct, so the base offense level is increased by another 2 levels. PSR ¶¶ 54, 61, 68, 75. Lazzaro had sex with Victim A, Victim B, Victim C, Victim D, and Victim E. Each victim testified that she engaged in sex for money with Lazzaro on more than one occasion. These commercial sex acts were corroborated by phone records and ride-share records.

An adjustment for obstruction of justice applies to Victim C.  PSR ¶ 71.  Castro Medina then provided alcohol, money, and vapes to Victim C in an effort to buy her silence.  *Id.*

In arriving at the advisory guidelines range, the greatest adjusted offense level is used, which is 36. PSR ¶ 84. Because there were at least four separate victims, the total number of units is 4. PSR ¶ 81. This leads to a four-level increase to the offense level, resulting in a combined adjusted offense level of 40. PSR ¶ 83.

A Chapter Four enhancement applies because, technically, Castro Medina's engaged in a pattern of activity involving prohibited sexual conduct. PSR ¶ 85. A pattern of activity under U.S.S.G. § 4B1.5, comment. n.4(B), is defined as prohibited sexual conduct with a minor on at least two separate occasions. An occasion may be considered without regard to whether it occurred during the course of the instant offense or resulted in a conviction for the conduct that occurred. Here, Castro Medina and Lazzaro engaged in sex trafficking of a minor with each of the five victims. Because trafficking of each victim qualifies as at least one occasion of prohibited sexual conduct, the five-level enhancement applies.

Additionally, Castro Medina is entitled to a reduction based on her thorough acceptance of responsibility. Castro Medina alerted the Government early to her willingness to cooperate in the prosecution of her co-defendant and to accept responsibility for her crimes by pleading guilty. As such, she has demonstrated acceptance of responsibility and receives a 3-level reduction to the adjusted base offense level. PSR ¶¶ 48, 49, 86, 87.

All combined, this results in a total offense level of 42. With a criminal history category I, the advisory guidelines range is 360 months to life. PSR ¶ 143.

### B. Application of the Repeat and Dangerous Sex Offender Enhancement

For all of the reasons the Court articulated at Lazzaro's sentencing, the Government is asking that the Court to either not apply or to vary downward as to the Chapter Four Repeat and Dangerous Sex Offender Against Minors enhancement based on reasons as outlined in the PSR at paragraph 165. It is even more inappropriate in Castro Medina's case. Unlike Lazzaro, Castro Medina did not engage in the commercial sex acts with the young victims. And, while technically accounting for different harms,[1] Castro Medina already received a four-level increase for the number of victims she recruited into the sex trafficking conspiracy.

If this enhancement were not applied, Castro Medina would have a total adjusted offense level of 37 and an advisory sentencing guidelines range of 210 to 262 months of imprisonment, which is identified by U.S. Probation and Pretrial Services as a more appropriate starting point to further consider the goals of sentencing. PSR ¶ 165.

---

[1] The Tenth Circuit explained that the multiple count enhancement in U.S.S.G. § 3D1.4 is to "provide incremental punishment for significant additional criminal conduct" whereas the § 4B1.5(b)(1) pattern is to protect minors from sex offenders who present a "continuing danger to the public." *United States v. Cifuentes-Lopez*, 40 F.4th 1215, 1221 (10th Cir. 2022)A (noting that the Chapter 4 pattern enhancement is derived from a Congressional directive "to ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual exploitation of minors").

## C.    Objections to the Guidelines Calculation

### 1.    *Role in the Offense*

Castro Medina maintains her position that she is a minor participant in the sex trafficking conspiracy.  PSR A.3.  Castro Medina principally relies on the fact that, while she recruited the victims, Lazzaro directed Castro Medina as to what type of girl he wanted and engaged in the commercial sex acts with the victims.

The Government recognizes that Castro Medina and Lazzaro played different roles in the conspiracy.  But Castro Medina played an essential or indispensable role in the criminal activity as the recruiter and was not substantially less culpable than Lazzaro.  U.S.S.G. § 3B1.2, comment n.5 and 3(C).  Castro Medina clearly understood the scope and structure of the criminal activity, realizing early on that payment from Lazzaro to her for engaging in commercial sex acts with Victim A made her a pimp.  Castro Medina nonetheless recruited girls that fit Lazzaro's liking, and she brought other friends and associates into the conspiracy to recruit additional girls for Lazzaro.  And Castro Medina benefitted significantly from participation in the conspiracy.  Indeed, there would have been no conspiracy without Castro Medina.

### 2.    *Inclusion of Victim D*

The Government objects to the PSR's failure to also account for the trafficking of Victim D by Castro Medina as jointly undertaken criminal activity.  The PSR found that, despite Castro Medina's guilty plea asserting that Victim D was a victim of the sex trafficking conspiracy she entered with Lazzaro, Victim D was not a victim "within the

scope" of the jointly undertaken criminal activity. PSR ¶ 50. To be sure, this argument is somewhat academic and will not have an impact on the ultimate sentence, inclusion of Victim D as a victim both for Lazzaro and Castro Medina is appropriate.

The PSR's determination that Victim D is outside the scope of the conspiracy focuses the issue too narrowly. In determining the scope of "jointly undertaken criminal activity," the district court "may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. §1B13, comment. (n.3.(B)); *see United States v. Sacus*, 784 F.3d 1214, 1219–20 (8th Cir. 2015). Under U.S.S.G. § 1B1.3, "a conspiracy defendant may be held accountable for the criminal activities of other co-conspirators provided the activities fall within the scope of criminal activity the defendant agreed to jointly undertake." *United States v. Flores,* 73 F.3d 826, 833 (8th Cir. 1996).

There is no dispute that Castro Medina directly recruited Victim E on Snapchat. Nor is there any dispute that Castro Medina did not directly recruit Victim D. In fact, they never met or communicated with each other. But the recruitment and victimization of Victim D meets the three prongs of "jointly undertaken criminal activity." U.S.S.G. § 1B1.3(1)(B).

First, Castro Medina's outreach to Victim E was the "but for" cause that brought Lazzaro into Victim D's orbit. Definitionally, the recruitment and patronizing of Victim D was within the scope of the conspiracy.

Second, Lazzaro was able to engage in commercial sex with Victim D for an entirely predictable reason:  Victim E brought a friend.  Castro Medina had done the same thing when she first went to Lazzaro's condo:  she brought Victim A.  Clearly, Castro Medina knew that some of the girls she recruited would bring friends to have sex with Lazzaro.  Indeed, Castro Medina knew that Victim C had brought an entire slumber party to Lazzaro's condo.  Similarly, Castro Medina knew that both Victim B and her sister had sex with Lazzaro.  It was certainly within the scope of the jointly undertaken activity, in furtherance of the sex trafficking conspiracy, and reasonably foreseeable that third parties would recruit additional girls.

Third, Castro Medina pleaded guilty to Victim D as one of the victims of the conspiracy.  As the Eighth Circuit held, "We have twice rejected claims by defendants that they should not be bound at sentencing by facts alleged in an indictment of which they pleaded guilty."  *United States v. White*, 408 F.3d 399, 402 (8th Cir. 2005) (citing cases involving a mail fraud scheme and a drug distribution conspiracy).

Although this objection does not impact the advisory guidelines range, it fairly accounts for the victimization of Victim D by both Castro Medina and Lazzaro, and the Government respectfully requests that this Court find the sex trafficking of Victim D to be jointly undertaken activity.

## II.    THE 18 U.S.C. § 3553(a) FACTORS

"[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to

determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49–50; 18 U.S.C. § 3553(a). The § 3553(a) factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). Consideration of the factors under 18 U.S.C. § 3553(a) warrants a custodial sentence of 84 months' imprisonment in this case followed by 5 years of supervised release.

## A.  Aggravating Factors:  Seriousness of the Offense and Need to Provide Appropriate Punishment

Dr. Sharon Cooper testified at trial about the varied impacts of sex trafficking on its victims. She identified four different categories. Tr. Vol. I at 95. First, is physical health. Victims of sex trafficking are at higher risk for significant health problems. Second, victims will typically have problems with drug and alcohol abuse if they had been given drugs or alcohol during the course of their victimization. *Id.* at 96. Third, victims are at higher risk of sexually transmitted infections, infertility, and major gynecological problems, including cancer. *Id.* Fourth, victims have significant psychological impact, including posttraumatic stress disorder (PTSD). *Id.* "Anxiety is extremely common. Panic attacks, very often. Depression. The leading cause of death in sex trafficking victims is suicide, and the second leading cause of death is HIV followed by homicide." *Id.* at 96–97. Such physical and mental health consequences can

manifest even when the victim has been sex trafficked on just one or two occasions. As Dr. Cooper testified, "We can see victims who have only had one encounter who are highly traumatized individuals, and especially when there's been alcohol facilitation because the victim doesn't really have a complete memory, necessarily, around the time of their victimization, which then leads them to imagine what may have happened . . . that causes them to have even more anxiety over what they feel they cannot remember." *Id.* at 99–100.

Castro Medina's role in offering up the victims as prey for Lazzaro was serious and worthy of a lengthy punishment. While Lazzaro likely would have found other underage girls to have sex with, these individuals became his victims because of Castro Medina's recruitment efforts. The devastating effects on these victims and their families caused by Lazzaro's exploitation cannot be overstated. And Castro Medina herself is well-acquainted with many of these ordeals given that Lazzaro first assaulted her and led her into addiction and alcoholism. Rather than sparing others, Castro Medina sent these other girls straight to Lazzaro's bed so that they could suffer the same fate. Even worse, she profited off of their pain to the tune of nearly $80,000.

The way in which Castro Medina recruited many of the victims is similarly troubling. She manipulated her friends at times when they were vulnerable, committing the ultimate act of betrayal. Castro Medina befriended Victim C over their shared mistreatment by their boyfriends and then suggested Victim C hang out with Lazzaro, who treated Victim C just like Castro Medina—getting her so drunk that she could not

move her body, let alone consent to sex. And Castro Medina used the high school boy she was tutoring to further her reach—ensnaring another friend, and another juvenile, in this criminal enterprise. Most egregiously, Castro Medina exploited Victim A's addiction and distance from her family, sending her 16-year-old "best friend" to have sex with a man who had assaulted and exploited both of them. While Victim A was disassociating as Lazzaro had sex with her, Castro Medina was counting out $100 bills over champagne (Gov. Ex. G-9). It is unsurprising that Victim A now reports, "I don't trust anyone anymore. I don't know if I ever will." PSR ¶ 46, p.11.

Finally, Castro Medina assisted Lazzaro in his attempts to obstruct this investigation and prosecution. Once again, she preyed on Victim C's insecurities to obtain what was best for herself, attempting to prevent Victim C from speaking with law enforcement officers. Castro Medina was also aware of the other attempts by Lazzaro to silence Victim A with the NDA, and to trick Victim C into lying about her age on film. And Castro Medina solicited Lazzaro's help to successfully fight an inquiry by the University of St. Thomas into what the two of them had done to Victim A. Only when she was finally charged and arrested did Castro Medina own up to her role in victimizing so many others.

**B.** **Mitigating Factors:  Personal History and Characteristics and Little Need for Specific Deterrence**

On the other hand, there are numerous factors that mitigate Castro Medina's culpability and warrant leniency in sentencing. The PSR describes a difficult upbringing

involving physical and emotional abuse and neglect, particularly from Castro Medina's father. PSR ¶¶ 100–03. Indeed, the differences in ACE scores between Castro Medina and Lazzaro is striking, with Castro Medina receiving a score more akin to the majority of defendants who appear before the Court.

This difficult childhood likely contributed to Castro Medina's idolization of Lazzaro, despite the fact that he previously sexually assaulted her. *See* Tr. Vol. II at 309; Tr. Vol. IV at 801. Castro Medina explained at trial, "He became my whole world. Like the moment I woke up, I was talking to Tony. The moment I fell asleep, I was talking to Tony. If he said something along the lines of 'I don't like this,' then all of the sudden I don't like it either. I was very influenced by Tony." Tr. Vol. II at 335–36. Lazzaro made Castro Medina dependent on him, paying her school tuition and rent and employing her at both his property management company and his recruiter. *Id.* He also provided free-flowing alcohol and illicit Adderall, leading Castro Medina to "bec[o]me an addict and an alcoholic" at the age of 18 years old. *Id.* at 336–38.

In the time since her release from custody, however, Castro Medina has turned her life around. While on pretrial release, she has achieved sobriety, undergone counseling, and resumed college classes. Most notably, Castro Medina provided the Government with substantial assistance in this case. She cooperated soon after her arrest. She alerted the Government and safeguarded anonymous payments that were no doubt attempts by Lazzaro to buy her silence. And Castro Medina's full day of

testimony about her conduct as Lazzaro's recruiter was devastating to Lazzaro's defense.

Indeed, comparing Castro Medina's behavior since arrest to Lazzaro's is telling. Unlike Lazzaro, Castro Medina did not draw out the legal process, forcing her victims to endure uncertainty as she pursued frivolous legal claims. Most importantly, Castro Medina has expressed sincere remorse for her conduct and empathy for her victims: "I feel terrible about what I did. I regret it." Tr. Vol. II at 272. When asked to describe her conduct, Castro Medina said, "I think it's disgusting and I think it's horrible, and I think it never should have happened." *Id.* at 334.

### C. A sentence of 84 months' imprisonment will not create unwarranted sentencing disparities.

The Government is not aware of any sentences in comparable cases that would create significant disparities among defendants with similar records who have been found guilty of similar conduct if the Court imposes a custodial sentence of 84 months.

Raquel Mone Belcher's case has many similarities to Castro Medina. *See United States v Raquel Mone Belcher*, 15-cr-142 (JRT/SER) (ECF No. 104). Belcher had a horrific upbringing as the victim of abuse and an addict. She was engaged in commercial sex acts herself. While she played a critical role in recruiting a 15-year-old, a 16-year-old, and a 17-year-old girl for her co-defendant Philip Loyd to sex traffic and to produce a child pornography video of one of the girls, Belcher was also one of Loyd's victims. Like Castro Medina, Belcher pleaded guilty early, accepted responsibility for her crime,

and agreed to cooperate against Loyd, including testifying if needed. Belcher was sentenced to 52 months in prison and 10 years of supervised release. *United States v Raquel Mone Belcher*, 15-cr-142 (JRT/SER) (ECF No. 104).

The Government is not aware of any other comparable cases bearing sufficient similarities to this case such that imposing a custodial sentence of 84 months on Castro Medina would create an unwarranted disparity.

## III.  SUPERVISED RELEASE

Supervised release "is a unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), that "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000).  It "is not punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994).  Rather, "congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty." *Johnson v. United States*, 529 U.S. 694, 708-09 (2000).

In the main, Congress authorized only short terms of supervised release.  For Class A felonies, the most serious category of federal offenses, a supervised release term ordinarily may not exceed five years.  18 U.S.C. § 3583(b)(1).  Child exploitation crimes, however, fall into a discrete group of offenses for which Congress went further, mandating a minimum supervised release term of five years and authorizing a maximum term of life.  *Id.* § 3583(k).  This suggests that Congress saw a grave danger to public safety from individuals who seek to exploit children, beyond the danger posed by a

typical felon. Indeed, the Guidelines urge district courts to impose the maximum supervised release term available for sex offenses. *See* U.S.S.G. § 5D1.2(b).

Here, the Government recommends that the Court impose a supervised release term of five years. Castro Medina has done very well on pretrial release. A term of supervised release will assist in Castro Medina's transition from custody to the life she has planned for herself after incarceration, including completing her education and attending graduate school. The Government is confident that Castro Medina will be able to achieve these goals, and that a U.S. Probation Officer will assist in those efforts.

## IV. RESTITUTION

Castro Medina has agreed to pay restitution to "all victims of her crimes." ECF No. 272 at ¶ 12. The Government reiterates the restitution request previously briefed to the Court and incorporates by reference all arguments and exhibits presented in the Government's materials concerning Lazzaro's sentencing, including those that will be forthcoming on August 23, 2023. The Government asks that, for any restitution awarded by the Court, Lazzaro and Castro Medina be made jointly and severally liable. Additionally, the Government notes that Castro Medina has preserved $20,000 that was anonymously sent to her in the course of this investigation and previously agreed that this amount would be put towards restitution and special assessments. *Id.*

## IV. FORFEITURE

Castro Medina has agreed to forfeit to the Government: (1) an Apple iPhone 11, serial number FK2ZJ2BHN72J; (2) an Apple MacBook Air-A2179 with charger,

serial number C02D7EUDMNHP, (3) an Apple iPhone 12, serial number F17DNKFE0DXP; (4) a 2015 Mini Cooper S, VIN WMWXP7C54F2A38757, and (5) $2,000 in currency.  ECF No. 272 at ¶ 14.  As part of her plea agreement, all of these items are in the Government's custody.

## CONCLUSION

For the foregoing reasons, the Government respectfully recommends that the Court impose a sentence of 84 months' imprisonment, 5 years of supervised release, restitution to the victims, and forfeiture as agreed upon by the parties.


Dated: August 22, 2023                              Respectfully Submitted,

                                                    ANDREW M. LUGER
                                                    United States Attorney

                                                    /s/ *Emily Polachek*
                                                    BY: EMILY A. POLACHEK
                                                    Attorney Reg. No.0390973

                                                    LAURA M. PROVINZINO
                                                    Attorney Reg. No. 0329691

                                                    MELINDA A. WILLIAMS
                                                    Attorney Reg. No. 491005 (D.C.)
                                                    Assistant United States Attorneys