UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Cr. No. 21-173 (PJS/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **DEFENDANT'S POSITION** |
| vs. | ) | **REGARDING SENTENCING** |
| | ) | |
| GISELA CASTRO MEDINA (2), | ) | |
| | ) | |
| Defendant. | ) | |

*"[W]here I'm from, there's barely any education on sex trafficking and what it looks like. I thought sex trafficking was this guy in a van who would come and kidnap you and sell you overseas. I didn't think that sex trafficking could be so -- how do you say -- inconspicuous."* (T. 480)[1]

~Ms. Castro Medina on cross-examination

[When asked what she thinks about her conduct] *"I think it's disgusting and I think it's horrible, and I think it should have never happened."* (T. 334)

~Ms. Castro Medina on direct examination

## **INTRODUCTION**

Gisela Castro Medina met co-defendant Anton Lazzaro in May 2020 at age 18

(ECF No. 422, ¶ 11).  In December 2020, search warrants were executed in this case

(ECF No. 422, ¶ 31).  Ms. Castro Medina was arrested on August 12, 2021 in Florida (at

age 19), appeared in federal court in Minnesota on September 23, 2021, and was released

from custody the next day (ECF No. 422, p. F.2).  From the time Ms. Castro Medina met

Mr. Lazzaro until her arrest, 16 months had passed.  The actual sex trafficking occurred

---

[1] *United States v. Lazzaro* Jury Trial Transcript of Ms. Castro Medina's testimony.

over only eight months (May 2020 to December 2020).  Ms. Castro Medina has been on pretrial release for almost two years—far longer than the time of the sex trafficking, and longer than from the time she met Mr. Lazzaro until her arrest.  In these (nearly) two years, Ms. Castro Medina has been sober, in treatment, in therapy, in school, volunteering, and in AA.

On December 19, 2022, Ms. Castro Medina pleaded guilty to Count 1 of the Indictment, Conspiracy to Commit Sex Trafficking of Minors, and Count 10, Sex Trafficking—Obstruction.  On March 23, 2023, Ms. Castro Medina testified against Mr. Lazzaro.  She now awaits sentencing.

For the reasons set forth below, Ms. Castro Medina, by and through her attorneys, Elizabeth Duel and Ryan Garry, asks this Court to sentence her to time served and supervised release.  If this Court imposes prison time, then Ms. Castro Medina asks for a voluntary surrender with a delayed turn-in date.

## LEGAL STANDARD

The law on sentencing is well-settled.  The Court is first to resolve any factual and legal disputes related to the PSR, calculate the statutory minimum and maximum sentences, and determine the corresponding Sentencing Guidelines range.  *United States v. Feemster*, 572 F.3d 455, 460–61 (8th Cir. 2009).  Next, the Court is to consider if a departure from the guidelines range is warranted.  Finally, the Court is tasked with deciding whether a variance is necessary as it must impose a sentence that is "sufficient, but not greater than necessary" to achieve the statutory sentencing objectives. 18 U.S.C. § 3553(a).

## OUTSTANDING PSR OBJECTIONS

Ms. Castro Medina does not pursue minor factual disagreements with the PSR as they do not affect the guidelines calculations.  She does, however, maintain her position that she was a minor participant and should receive the 2-level reduction.  She also maintains her position that the 5-level enhancement under Chapter 4 for engaging in a pattern of prohibited sexual conduct activity should not apply.  Finally, on August 8, 2023, pursuant to the plea agreement, Ms. Castro Medina turned in her Mini Cooper to the government and asks that it not be considered as an asset as it is no longer in her possession.

The government's sole objection (they also made some minor corrections and suggestions not addressed here) to the preliminary PSR was the exclusion of Victim D as one of Ms. Castro Medina's victims (ECF No. 410).  While Ms. Castro Medina appreciates the final PSR's continued exclusion of Victim D, she does not seek to withdraw from the plea agreement.  In addition, she appreciates both the PSR and government's agreement to remove Victim F as a victim.

## THE OFFENSE CONDUCT AND ACCEPTANCE OF RESPONSIBILITY

Given the detailed jury trial testimony and extensive facts in the plea agreement, plea hearing, and PSR, only brief facts are included here.  Ms. Castro Medina's own words, at 21 years of age, best illustrate the offense, her acceptance of responsibility, and her cooperation; and so her testimony on direct examination is quoted here at length:

    Q.    Did you commit that crime, conspiracy to commit sex trafficking of
          minors?
    A.    Yes, I did.

Q.      Who did you commit it with?

A.      Anton Lazzaro. (T. 267)

. . .

Q.      Why did you plead guilty?

A.      Because I was guilty of the crime. (T. 268)

. . .

Q.      Under the cooperation agreement, what do you understand is your end of the bargain? What do you have to do?

A.      I have to tell the truth. (T. 268)

. . .

Q.      Are there things here that you did that were bad and ugly?

A.      Absolutely. (T. 270)

. . .

Q.      I want to go back to when you first met the defendant, but before we do that, in your own words, can you tell the jury what you did here?

A.      I found underage girls, minors, for Anton Lazzaro to have sex with in exchange for money. (T. 271)

. . .

Q.      Are you proud of what you did?

A.      No.

Q.      How do you feel about what you did?

A.      I feel terrible about what I did. I regret it. (T. 271–72)

. . .

Q.      Now, when the defendant brings up recruiting and is showing you how to do this, does he say what's in it for you?

A.      Money.

Q.      Does he say that explicitly?

A.      I mean, it was implied and sometimes explicitly, yes.

Q.      Is that what you did get out of this?

A.      Yes.

Q.      So did you agree to be the defendant's recruiter?

A.      Yes. (T. 331–32)

. . .

Q.      Ms. Castro Medina, at the time, did you think about what you were doing as wrong, messed up?

A.      No, I didn't.

Q.      Looking back, what do you think?

A.      I think it's disgusting and I think it's horrible, and I think it should have never happened. (T. 334)

. . .

Q.      Were you paid for all the people you recruited to have sex with the defendant?

A.      Yes.

4

Q.      Who paid you?
A.      Tony did.
Q.      Okay. When we talk about this conspiracy, did there come a time
        where you reached out to others to help you in doing your recruiting
        job?
A.      Yes. (T. 344)
. . .
Q.      What were you doing for the money?
A.      Absolutely nothing. I wasn't sure at the time, but looking back, I was
        providing a service. I was finding Tony women, and he was having
        sex with them and I was getting paid for it. (T. 358)
. . .
Q.      Ms. Castro Medina, your role in this conspiracy, what was it?
A.      My role in the conspiracy was to find Anton Lazzaro girls to have sex
        with and, in exchange, get paid for it.
Q.      Would he pay them?
A.      Yes.
Q.      And what was his preference in age?
A.      Sixteen.
Q.      Did you do that?
A.      Yes. (T. 431–32)

Regarding cooperation, on cross-examination, Ms. Castro Medina stated, "I agreed
to tell the truth to the prosecutors about the case" (T. 494–95).  "I deliberated with my
attorneys for some time, and I believe in accountability, so I chose to plead to the two
counts that I feel as though I'm most guilty of, yes" (T. 495).

On redirect examination, Ms. Castro Medina testified to her complete knowledge
of the sentence she faces:

Q.      Okay. You are facing what in prison?
A.      A life sentence.
Q.      And without getting into the details, the fallout of this case, has this
        been great for you?
A.      Could you explain?
Q.      How has your life been affected by all of this?
A.      It's been pretty bad.

5

Q.     You are facing a Sentencing Guidelines range, as Mr. Gerdts explained, of either just under 16 years, 19 and a half years, or life, right?

A.     Correct.

Q.     You're 21 now?

A.     Yes.

Q.     So that would make you, if Judge Schiltz imposed any of those guidelines, either 37 or 40 years old when you got out, or never; is that right?

A.     That's right.

Q.     Does that feel like a sweetheart deal?

A.     Not at all, no. (T. 513–14)

. . .

Q.     You understand that victims have a right to appear at that sentencing?

A.     Yes.

Q.     Do you think the victims are going to go easy on you in this case?

A.     No.

Q.     Ms. Castro Medina, you want to get married one day, maybe have kids?

A.     Hopefully.

Q.     You've told us you did some terrible things in this case, right?

A.     Yes.

Q.     Understanding that you did terrible things, were you the one who gave alcohol to 15- and 16-year-old girls, the victims?

A.     Sometimes.

Q.     These victims?

A.     Sometimes. With [Victim C].

Q.     That's fair.  Were you the one who gave them alcohol and then paid them for sex?

A.     No.

Q.     Were you the one who had sex with those girls?

A.     No.

Q.     Okay. Just to put it in perspective. (T. 514–15)

. . .

Q.     Looking back, the idea that the defendant was fixing the girls, how does that strike you?

A.     It's not correct.

Q.     What was he doing?

A.     He was grooming them.

Q.     And then what was he doing?

A.     He was having sex with them and traumatizing them and giving them money, and that's . . . (T. 525–26)

Ms. Castro Medina testified from approximately 9:00 a.m. until approximately 5:00 p.m. with three breaks; her testimony yielded approximately 260 pages of type. This Honorable Court noted that Ms. Castro Medina was "an exhausted witness," yet Ms. Castro Medina politely told Mr. Lazzaro's counsel that she did not mind staying on the stand rather than rushing through questions (T. 511–12). Finally, after a full day of testimony, this Court said, "Ms. Castro Medina, thank you. I know it's been a very long day. You are excused" (T. 528).

## BACKGROUND

Ms. Castro Medina's short life thus far can be separated into three time periods: pre-Mr. Lazzaro, Mr. Lazzaro, and post-Mr. Lazzaro.

### Childhood (pre-Mr. Lazzaro)

Ms. Castro Medina, a 21-year-old Latina woman, was born in Texas and moved to Minnesota with her family around the age of 5 (ECF No. 422, ¶ 99). Ms. Castro Medina learned that her father physically abused her mother while pregnant with her. Growing up, her parents would play her against each other; her father told her that her mother had wanted to abort her because it was thought she would have a mental disability, and her mother told her that her father wanted to abort her for the same reason. She grew up believing that she was not wanted. Ms. Castro Medina's father drank heavily as she grew up,[2] and she remembers physical assaults between her parents (ECF No. 422, ¶ 100). Shortly after they arrived in Minnesota, Ms. Castro Medina's father opened a restaurant

---

[2] Even after his 2014 and 2018 DWIs, her father has continued to drink, and he was charged with DWI in May 2023 (ECF No. 422, ¶ 101).

with his friend and made it very clear that he prioritized his restaurant over his family (ECF No. 422, ¶ 100). Her father would not pay their household bills, which would result in their utilities being shut off, and not provide food at home (ECF No. 422, ¶ 100). At times, Ms. Castro Medina would go to the restaurant to eat because there was no food at home (ECF No. 422, ¶ 100). Her parents frequently fought and would talk badly about each other to Ms. Castro Medina; her mother would degrade her father in front of her and tell her that he was going to die or get a DWI when he was not home, while her father would degrade her mother in front of her and say that her mother did not want her.

Ms. Castro Medina's father was cruel and abusive towards her, using a belt to discipline her and a horse whip to discipline her older brother (ECF No. 422, ¶ 100). Both of her parents subjected her to horrific physical and emotional abuse, as well as many forms of neglect (see the attached therapy letter). Ms. Castro Medina and her younger sister stated that they would leave parts of their house to avoid their parents' loud arguments (ECF No. 422, ¶ 103). While child protection became involved a couple of times, the family was not compliant and the cases were closed (ECF No. 422, ¶ 103).

In college, Ms. Castro Medina wrote an essay about her childhood abuse, including one time where her mother lifted her up by her hair at age 6:

> [M]y childhood experiences still haunt me. All the times I misbehaved came with severe consequences. Even if the moments I misbehaved were as minuscule as not showering for a couple of days. The consequences have shaped every ounce of me. The memories of my experiences as a child have been engraved in my mind, the images of my body covered in bruises have yet to be erased. The feeling of aloneness has never left my place. I have accepted these occurrences have made me the person I am now. They have made me a more determined, independent, and courageous woman.

(ECF No. 422, ¶ 103).

In school, she and her brother were two of only three Hispanic students (ECF No. 422, ¶ 100).  She knew she was different from the other students because of this.  Her therapist wrote, "Outside of the home, Gisela excelled academically, but struggled socially at school, always feeling alone and like she did not belong.  Gisela grew up in a part of Minnesota that was predominately White.  Gisela experienced bullying, racial profiling, and racial discrimination as a Latina throughout her childhood in the public school system" (see attached therapy letter).

Growing up, Ms. Castro Medina self-harmed and attempted suicide multiple times, leading to a couple hospitalizations (ECF No. 422, ¶ 112).  Looking back, she believes she has struggled with depression, anxiety, and PTSD for a long time (ECF No. 422, ¶ 113).

As she got older, her parents remained strict and controlling, not allowing her to attend school sports games or stay with friends (ECF No. 422, ¶ 100).  Nor were they

 supportive or present in her school life.  She participated in theatre at school, earning a letter in theatre, but neither of her parents attended any of her shows (ECF No. 422, ¶ 100).  Ms. Castro Medina's former boyfriend, M.N., told the PSR writer that her parents were not affectionate towards her in the typical sense, they never came to school events involving her, did not appear excited when she was accepted

to college, did not visit her in college, and had a strict curfew but otherwise were hands-off (ECF No. 422, ¶ 107).  Ms. Castro Medina pursued college admission even though her parents neither encouraged nor assisted her in seeking higher education (ECF No. 422, ¶ 104).



Ms. Castro Medina at approximately 17 years of age

In short, Ms. Castro Medina grew up in a house where she was neither loved nor supported, where she was subjected to horrific physical abuse, where she was neglected, where she did not have enough food to eat, and where she simply was not safe. At school, she was targeted by students and staff due to her ethnicity.

### Adulthood (Mr. Lazzaro)

A few weeks before she graduated from high school, at age 18, Ms. Castro Medina met Mr. Lazzaro (ECF No. 422, ¶ 104) with 16-year-old Victim A.  "My best friend was [Victim A]" (T. 272).  It was Victim A's idea to get on a website called SeekingArrangements, and she created a profile for Ms. Castro Medina with Ms. Castro Medina's permission (T. 438).  On the first night Ms. Castro Medina met Mr. Lazzaro, she brought Victim A along (T. 475).  Victim A had sex with Mr. Lazzaro and then told Ms. Castro Medina that it was her turn to do so (T. 474).  Ms. Castro Medina had sex with Mr. Lazzaro on two different occasions (T. 521):

> Q.    You described your experience with Tony, having sex with him, that both times you were too drunk to have sex and one time you were in and out of consciousness.  Do you remember that testimony?

A.      Yes. (T. 521)

When asked if she would have had sex with Mr. Lazzaro without the money, Ms. Castro Medina said no (T. 307).  Ms. Castro Medina very clearly told the jury that she received money from Mr. Lazzaro for "[h]aving sex with him" (T. 318, 326).

Mr. Lazzaro "was really kind and caring" and "[v]ery understanding" (T. 275).  "It felt like I had someone that would listen to me for the first time" (T. 275).  When Ms. Castro Medina first met Mr. Lazzaro, he quickly gained her trust: "even though like whatever we were going through at the time felt really bad, he put some light to it" (T. 283).  "It made me feel like finally there's a person that will listen to me and, like, I can vent to and be a friend with" (T. 284).  "[H]e just seemed like he really cared about [Victim A] and I" (T. 327).

When Mr. Lazzaro initially asked Ms. Castro Medina to be his recruiter, she said no (T. 310–11).  He told her that he had used recruiters in the past and explained it to be akin to "matchmaking" (T. 310, 311).  Eventually, Ms. Castro Medina agreed and learned that Mr. Lazzaro "preferred what he calls broken girls, sluts, whores.  At one point I was even referring to myself as like a slut, a whore, or like a broken girl" (T. 332–33).

Over time, her relationship with Mr. Lazzaro "morphed into what was once like a friendship to a really close friendship to what now is like you're like a father figure to me, like I idolize you" (T. 335).  "He became like my whole world. Like the moment I woke up, I was talking to Tony. The moment I fell asleep, I was talking to Tony. If he said something along the lines of 'I don't like this,' then all of a sudden I don't like it either. I was very influenced by Tony" (T. 335–36).  Ms. Castro Medina's former boyfriend,

M.N., corroborated this and saw the influence Mr. Lazzaro had over Ms. Castro Medina and that "she would do whatever he said; if he wanted her somewhere, she would leave and go there . . ." (ECF No. 422, ¶ 107).

Mr. Lazzaro fully supported her financially:

Q.  We're going to get into the money later today, but was he supporting you financially?
A.  Yes, everything. I mean, the situation ended up very -- getting me very isolated, and I only had Tony to depend on for everything.
Q.  I think at one point you said it was you two against the world; is that right?
A.  Yes.
Q.  Is that how it felt?
A.  That's how it felt. (T. 336)

Mr. Lazzaro knew what he was doing.  He became a friend and father figure to Ms. Castro Medina:

Q.  Were there moments when the defendant was kind to you?
A.  Yes, there was moments he was kind to me.
Q.  Very kind?
A.  Yes.
Q.  How would it feel when the defendant was kind to you?
A.  It felt like a father praising a child, so that's how I felt. I mean, I would tell him about my grades and I would tell him about how I'm doing good in this or that, and I felt really happy when he approved.
Q.  Again, without getting into it too much, do you have a very difficult relationship with your own father?
A.  Yes.
Q.  Were you closer to the defendant than you were to your father?
A.  Yes.
Q.  Were there moments where he was unkind to you?
A.  Yes.
Q.  And how would those moments feel?
A.  That felt like I was like shunned or something. I freaked out every single time it happened. It would cause me a lot of anxiety.
Q.  If the defendant made a suggestion of something you should do, did you take it as a suggestion?
A.  I took it as an order. I did it. (T. 339)

Mr. Lazzaro appeared "almost God-like" (T. 343).  "I did anything Tony wanted me to do" (T. 425).

After the second time they all met, Victim A continued to meet up with Mr. Lazzaro without Ms. Castro Medina's assistance (T. 477).  Afterwards, Victim A would bring money to Ms. Castro Medina from Mr. Lazzaro (T. 477).  Ms. Castro Medina "did not think that I was pimping her out at the time. . . . I was confused about the whole situation" (T. 478).  Now, however, Ms. Castro Medina knows what she did: "We were both young, and looking back, I feel as though I definitely pimped her out.  I sex trafficked her.  At the time it didn't seem that way" (T. 479).  "I cared a lot about [Victim A].  She was my best friend at the time" (T. 482).  She clarified:

> Q. At the time were you confused about what you were doing with [Victim A]?
> A. Yes.
> Q. Looking back, are you confused?
> A. Looking back, I'm not confused.
> Q. What were you doing?
> A. I was pimping her out, or sex trafficking her. (T. 524)

Ms. Castro Medina's actions in Colorado exemplify her reliance on and dedication to Mr. Lazzaro.  For a time, Ms. Castro Medina dated an abusive man (B.S.) (T. 352).  She was in Colorado with B.S. when they got into an argument, she locked him out of the hotel room, and he tried to break in; she desperately wanted to come home, so she found someone for Mr. Lazzaro to have sex with so he would give her money or transportation home (T. 352).  Notably, she did not call her parents, her brother, her friends, Victim A, or anyone else.  In her world, all she had was Mr. Lazzaro.  And he would only help her if

she found him more victims—not out of the goodness or kindness of his heart.  This Colorado incident makes it clear that Mr. Lazzaro never cared for Ms. Castro Medina; he only used her to find young girls with whom to have sex.  Ms. Castro Medina could not see it.  After a childhood full of every kind of abuse, why would she expect better?

After Mr. Lazzaro and Ms. Castro Medina were aware of the federal investigation, Mr. Lazzaro became concerned and tried to bribe Ms. Castro Medina to not talk to the authorities:

> Q.    Okay. And in exchange for your silence, what did he offer to do?
> A.    He mentioned buying me a house and grad school expenses.
> Q.    Did you believe he could do those things?
> A.    Obviously, yes.
> Q.    When you say "obviously" -- we're about to get into the money in just a moment -- had he already bought you a car?
> A.    Yes.
> Q.    Funded your lifestyle?
> A.    Yes. (T. 397–98)
> . . .
> Q.    And you said you responded, you don't have to do any of that; I love you?
> A.    Yes.
> Q.    I would never do that.
> A.    Yes.
> Q.    Was that true in the moment?
> A.    In the moment, it was very true.
> Q.    What was the defendant's influence over you at that point?
> A.    He was my whole life.
> Q.    And what he didn't want you to do is do what you're doing today?
> A.    Yes. (T. 398)

Ms. Castro Medina "thought Tony could fix everything" (T. 491).  But justice caught up with both of them, and Mr. Lazzaro could not "fix" it.

Every corner of Ms. Castro Medina's life was changed by Mr. Lazzaro: her school work, her chemical health, and her mental health.

14

## A. School

Ms. Castro Medina began college in the Fall of 2020 (ECF No. 422, ¶ 104). She was a good student prior to meeting Mr. Lazzaro. After meeting him, her grade point average plummeted in her last semester of high school, and she had to take summer classes (ECF No. 422, ¶ 128). While in college, she had a low grade point average due to not attending many classes and her alcohol use (ECF No. 422, ¶ 129).

## B. Chemical Health

Prior to meeting Mr. Lazzaro, Ms. Castro Medina had limited drug and alcohol use (ECF No. 422, ¶ 122–23). Once she arrived in college, she began drinking, which she believes "was mostly motivated by her trying to escape feelings related to her childhood trauma and her abusive relationship with [B.S.]. It was facilitated by the availability and acceptability of alcohol use in college, and she was able to pass as 'the fun girl who drinks,' rather than a person using alcohol as a coping mechanism" (ECF No. 422, ¶ 123). Her alcohol use continued, and Adderall use began, as her relationship with Mr. Lazzaro deepened. Mr. Lazzaro strongly influenced Ms. Castro Medina's controlled substance and alcohol use:

> Q.   When you first met Tony, what was your substance abuse situation like?
> A.   I didn't have one.
> Q.   Were you drinking?
> A.   Just as much as a regular high schooler. I mean, maybe on a special occasion, yeah.
> Q.   Did that sobriety situation change over time with Tony?
> A.   Yes. I became an addict and an alcoholic.
> Q.   Tell the jury how that happened.

> A. He supplied most of my alcohol and all of my Adderall, and I would be -- there wasn't like long periods of sobriety. I was drunk almost every single day.
>
> Q. During this period of time?
>
> A. Yes.
>
> Q. You also said that you became an Adderall addict. How did that come about?
>
> A. I needed Adderall to do like any minimal task, like school. Typically you can do that without Adderall, but I found it to be daunting to do it without Adderall. (T. 336–37)
>
> . . .
>
> Q. Did it feel like you were keeping it together?
>
> A. Absolutely not. (T. 337)

Ms. Castro Medina was addicted to Adderall, and Mr. Lazzaro was her supplier (T. 338).

As shown on cross-examination:

> Q. Now, during the course of your relationship with Tony, he expressed concern about your physical health and your use of chemicals, true?
>
> A. Yes.
>
> Q. For example, he often told you not to drink so much, true?
>
> A. But then he supplied the alcohol.
>
> Q. He supplied the alcohol but told you not to drink so much, right?
>
> A. Yes.
>
> Q. And you were an adult at the time, true?
>
> A. Yes.
>
> Q. He was concerned about your mental health, and he provided -- he arranged for you to meet some doctor to assist you with that, true?
>
> A. True.
>
> Q. You got a diagnosis and there was a prescription for medication, right?
>
> A. Right.
>
> Q. And he often told you about making sure to take your medication?
>
> A. Yes. (T. 444–45)

And on redirect examination:

> Q. . . . He expressed concern that you were drinking?
>
> A. Sometimes, yes.
>
> Q. Who was giving you the alcohol?
>
> A. Tony.
>
> Q. He expressed concern that you were on drugs?
>
> A. Yes.

Q.      Who was giving you the Adderall?

A.      He was. (T. 525)

## C. Mental Health

After meeting Mr. Lazzaro, he convinced Ms. Castro Medina that she was bipolar and compelled her use of medication (ECF No. 422, ¶ 113). She now believes she was not bipolar, but rather the "symptoms" she experienced were from her alcohol and Adderall use (ECF No. 422, ¶ 113). She also developed an eating disorder after meeting Mr. Lazzaro (T. 338) because he told her that he did not like fat people. While Mr. Lazzaro did not physically abuse her, force feed her medication or alcohol, or tie her down, she was compelled to act in accordance with his directives and desires due to his charm and appearance of love for her.

## Adulthood (post-Mr. Lazzaro)

On August 12, 2021, 19-year-old Ms. Castro Medina was planning to board a plane from Florida to turn herself in to federal agents in Minnesota on the felony arrest warrant in this case. Unfortunately, she appeared at the airport in Florida extremely intoxicated and was hospitalized and held in custody (ECF No. 422, ¶ 124). She was transported up to Minnesota and appeared in Court on September 23, 2021 (ECF No. 422, p. F.2).

After her arrest and release in September 2021, Ms. Castro Medina completed substance abuse treatment while living at a residential reentry center (ECF No. 422, ¶¶ 124, 125). She then began mental health programming (ECF No. 422, ¶ 125). Further, Ms. Castro Medina has been attending AA on a regular basis and noted that now that she

has been working through her trauma and mental health, she no longer feels the desire to drink or use drugs (ECF No. 422, ¶ 126). She has been sober since August 2021, and she has had all negative tests while on pretrial release (ECF No. 422, ¶ 127). Ms. Castro Medina's boyfriend, S.C., spoke with the PSR writer:

> [S.C.] and Castro Medina reconnected while she was at the halfway house as part of her pretrial conditions, and he saw then she had started making changes in her life. At that time, he wondered if she was only saying what he wanted to hear, but since then, he has seen that 'she made these changes in her life because it's what she wants. She knows that's what's best for her; it's not even about anybody else.' In retrospect, he believes that 'a perfect storm of events' led to her involvement in the instant offense, to include the poor relationship with her parents, and 'she felt heard by this person...it sounds like she didn't really consider the severity of what was going on there. I think she probably didn't want to consider it, given it was really one thing in her life that was making her feel kind of safe.' He hopes the Court will see 'the difference between the Gisela I met and the Gisela that exists right now...one good thing that has come out of this is that she has very much taken advantage of this opportunity of release to turn her life around and make a positive impact, which is what I imagine you would hope for in a pretrial release program. I can't imagine it being any more successful than it's been in this case.'

(ECF No. 422, ¶ 108).

Ms. Castro Medina has been granted more freedom as the case progressed. On March 25, 2022, Ms. Castro Medina's conditions were amended to allow her to move from the halfway house to her parents' home while still on house arrest (ECF No. 177). On June 30, 2023, her conditions were amended to remove home detention and impose a curfew (ECF No. 405). Throughout her case, while on the GPS monitor, Ms. Castro Medina was granted a number of furloughs to attend various events (ECF Nos. 93, 111, 116, 151, 156, 165, 227, 243, 283, 322, 329, 409). She was always compliant with the terms of the furloughs and her pretrial services officer supported her pro-social activities.

In September 2022, Ms. Castro Medina was granted a furlough to attend an event in California for and about sexual assault survivors.  During the event, Ms. Castro Medina gave a speech and advice on how to prevent sexual abuse, and she also participated in a discussion on the White House's Task Force's recommendations where a White House representative was present.

As explained by her therapist in the attached letter, Ms. Castro Medina is a unique mix of victim and defendant:

> From an untrained eye, it may seem like Gisela deliberately and consciously engaged in the criminal behaviors of helping her co-defendant, Anton Lazzaro, recruit underage girls to engage in sex acts in exchange for money. However, when you position this behavior within the context of PTSD, and the larger umbrella of developmental trauma, it becomes more complicated. Gisela's relationship with Anton can be characterized as a classic example of psychological grooming. Perpetrators of any type of relational abuse, but especially sex trafficking, are experts in the intentional and methodical process of psychological entrapment. They are able to identify vulnerabilities in their victims and exploit them through the grooming process. The grooming process begins with the perpetrator developing trust and connection with the victim. At this time point, the perpetrator is charming and kind, developing a relationship victims may describe as a family member or trusted friend. They can identify the unmet needs of their victim and position themselves to meet those needs, further reifying the trust and connection between themselves and their victim.
>
> For Gisela, she ached for a sense of belonging and security, deeply longing for a parental figure who noticed her, cared, and provided both a material and emotional sense of security. This longing only existed due to the extreme neglect and abuse she endured from her own parents. I can confidently say that had Gisela had a stable and healthy childhood, it is very unlikely she would be vulnerable to this situation. Based on Gisela's report, Anton positioned himself as a trusted friend, providing temporarily the emotional, relational, and material needs that Gisela longed for. Additionally, Gisela was experiencing abuse from her boyfriend [B.S.] and Anton served as a refuge for Gisela, making her feel cared about and safe from [B.S.]'s violence. Further, Gisela was provided various substances that altered Gisela's state of consciousness and positioned her to not only be emotionally and materially

dependent on her perpetrator, but also chemically as she developed an addiction to these substances. These factors led to a psychological entrapment where Anton maintained control of Gisela through her dependence on him. This allowed him to manipulate Gisela into cooperation in her own exploitation as well as the exploitation of other victims. Sadly, the result left Gisela engaged in horrific behaviors which harmed both Gisela and many other young girls.

. . .

Overall, Gisela has endured a resume of violence and trauma that most members in our society can only begin to imagine. The adversity of her childhood set her up for unhealthy coping and vulnerability to abusive relationships. She has fought to survive, and, in the course, she engaged in deeply wrong and harmful behaviors. She has now been on a pathway to restoration, healing, and well-being, moving from a place of accountability and honesty. I do not believe she is a threat any longer to our community, and I am confident that Gisela will continue on this path towards healing. My fear is that additional time in a correctional facility will dislodge Gisela's hard-earned hope in the milieu of trauma, depression and anxiety. My hope and request is that all systems will support Gisela in being able to continue accessing spaces and resources that promote her growth, healing, and recovery. If given the chance, I believe that Gisela can become a productive member of our society, using the costly lessons she has learned to not only better her own life, but encourage others to do the same.

Unfortunately, her trauma had not ended.  After Ms. Castro Medina and B.S. ended their relationship, her brother maintained a friendship with him (ECF No. 422, ¶ 105).  In May 2022, B.S., her brother, and a third individual went to Ms. Castro Medina's home.  Because she was on house arrest, she could not leave.  She hid in her room, had a panic attack, and called her drug/alcohol abuse counselor.  Ms. Castro Medina later petitioned for an Order for Protection, which was temporarily granted and later dismissed (ECF No. 422, ¶ 105).  While Ms. Castro Medina ceased contact with her brother for a time, in part due to his continued friendship with B.S. as well as negative comments he had made towards her about this case, their relationship has improved recently (ECF No.

422, ¶ 105).  Her brother had a baby in February 2023, and Ms. Castro Medina was able to see him and her new nephew (ECF No. 422, ¶ 105).

Currently, Ms. Castro Medina lives at home with her mother, maternal uncle, and younger sister (ECF No. 422, ¶ 109).  Ms. Castro Medina views her uncle as a fatherly figure (ECF No. 422, ¶ 109).  She tutors her younger sister and helped her become student of the month.  While her parents know about this case, they have not attended her plea hearing or trial testimony (ECF No. 422, ¶ 102).  When the charges initially came out, they called her a "whore" and "prostitute" (ECF No. 422, ¶ 102).  Her younger sister has also suffered; teachers have questioned her for information regarding Ms. Castro Medina's case.

Ms. Castro Medina has maintained a great relationship with her boyfriend, S.C., as well as his parents, who have been supportive of their relationship and Ms. Castro Medina as she has proceeded through this case.

While on pretrial release, Ms. Castro Medina has been working[3], volunteering, and taking college classes, and she has achieved a 4.0 grade point average (ECF No. 422, ¶¶ 130, 133–135).  She also earned a place on the Dean's Honor's List (ECF No. 422, ¶ 130).  As shown in the attached education documents, Ms. Castro Medina has received wonderful feedback from her professors, such as "I appreciate your intelligence and effort!" and "you are strong and intelligent."  Ms. Castro Medina has since earned her

---

[3] Ms. Castro Medina works approximately 20 hours per week at a restaurant and has recently started working for an advocacy group on an as-needed basis where she assists with surveys and talking to survivors of sexual assault.  Ms. Castro Medina is scheduled to meet with the Minnesota Department of Health in September to discuss her experiences with the advocacy group.

Associate's Degree, and she hopes to attend her graduation after the Fall 2023 semester. She has also been conditionally accepted to a college out-of-state (see attached education documents).

Ms. Castro Medina has worked hard to break free from Mr. Lazzaro.  She recalls that it took about six months to break free of him, to stop loving him, to stop caring about what he thought, to stop being loyal to him.  She now sees that the horrible things that she did were to gain Mr. Lazzaro's approval.

The culmination of her independence from Mr. Lazzaro was her decision to testify at his trial.  Prior to her trial testimony, her anxiety and fears mounted.  The minutes before she entered the courtroom, she was more scared than she had ever been: she was about to testify in a very public case in front of the man she had loved and idolized.  She was terrified to see him.  She also knew she was airing her deepest and darkest secrets for a packed courtroom and the media to hear.  As soon as she was on the witness stand, her maturity, confidence, and responsibility (to the victims and to herself) took over.  After her testimony, she felt free for the first time, and she hopes that her testimony gave credence to the victims' truths.

Ms. Castro Medina is at a turning point in her life where she should begin thinking about what sort of career she wants so that she can obtain the relevant degree.  She should be interning in her desired field.  However, her future is uncertain.  She has avoided dreaming about her future because she may go to prison and her life may be on hold for an unknown amount of time.  She desires to be a good, law-abiding member of society.

She wants to continue attending college, and she wants to have a family. She hopes she will be able to do so.

## **ARGUMENT**

A term of imprisonment "is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). A sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

After consideration of all of the mitigating factors in this case, a sentence of credit for time already served and a period of supervised release is sufficient to satisfy the statutory purposes of sentencing in this case.

Regarding sentencing, the parties and the PSR writer came to different conclusions about the application of the Sentencing Guidelines. While there was agreement as to the vast majority of the calculations, the differences in analyses resulted in the following ranges as listed in the plea agreement (ECF No. 272) and PSR (ECF No. 422):

Government:        45 AOL (becomes 43), I CH = life imprisonment

Defense:           36 AOL, I CH = 188–235 months imprisonment

PSR:               42 AOL, I CH = 360 months to life imprisonment

The differences in calculations, generally, are as follows with the discrepancies highlighted:

|  | Government | Defense | PSR |
|---|---|---|---|
| Base Offense Level | 30 | 30 | 30 |
| Undue influence | +2 | 0 | 0 |
| Use of computer | +2 | +2 | +2 |
| Sex act with 5 victims | +2 | +2 | +2 |
| Minor participant | 0 | –2 | 0 |
| Obstruction (Victim C) | +2 | +2 | +2 |
| Number of victims | +5 | +5 | +4 |
| Acceptance of responsibility | –3 | –3 | –3 |
| Chapter 4 enhancement | +5 | 0 | +5 |
|  |  |  |  |
| **Adjusted Offense Level** | 45 (becomes 43) | 36 | 42 |
| **Criminal History** | I | I | I |
| **Guidelines Range** | Life | 188–235 months | 360 months to life |

Despite the guidelines sentence, the PSR recommends that a sentencing analysis begin at

210 months based on a variance from the Chapter 4 enhancement (ECF No. 422, ¶ 165).

## I.   Outstanding PSR Objections and Guidelines Discrepancies

### A.  Minor Participant

Ms. Castro Medina maintains her position that she was a minor participant.  Under

the guidelines, a minor participant "is less culpable than most other participants in the

criminal activity."  U.S.S.G. § 3B1.2 cmt. 5.  "The fact that a defendant performs an

essential or indispensable role in the criminal activity is not determinative.  Such a

defendant may receive an adjustment under this guideline if he or she is substantially less

culpable than the average participant in the criminal activity."  *Id.* at cmt. 3(C).  Here, the

facts of the case show that Ms. Castro Medina is a minor participant.  While she recruited

victims for Mr. Lazzaro, it was Mr. Lazzaro who determined which victims he wanted,

directed Ms. Castro Medina on what to say and do, and so on.  It was also Mr. Lazzaro,

not Ms. Castro Medina, who engaged in the sex acts with the victims.  This is shown in

Ms. Castro Medina's redirect examination where the government put her role into perspective by confirming that it was not Ms. Castro Medina who was giving the girls alcohol and then paying for sex or having sex with the girls (T. 514–15).

If this Court disagrees with Ms. Castro Medina's position regarding her role, then she asks for a 2-level departure or a variance to account for her vastly different role from Mr. Lazzaro in this case.

### B.  Chapter 4 Enhancement

Ms. Castro Medina maintains her position that the enhancement under U.S.S.G. § 4B1.5(b) does not apply.  U.S.S.G. § 4B1.5(b) states:

> In any case in which the defendant's instant offense of conviction is a covered sex crime, neither §4B1.1 nor subsection (a) of this guideline applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct:
>
> (1)    The offense level shall be 5 plus the offense level determined under Chapters Two and Three.  However, if the resulting offense level is less than level 22, the offense level shall be level 22, decreased by the number of levels corresponding to any applicable adjustment from §3E1.1.
>
> (2)     The criminal history category shall be the criminal history category determined under Chapter Four, Part A.

Notably, Ms. Castro Medina did not engage in any sexual intercourse with the victims; here, she only connected them with Mr. Lazzaro.  Further, the background note states, "This guideline applies to offenders whose instant offense of conviction is a sex offense committed against a minor and who present[s] a continuing danger to the public."  Ms. Castro Medina does not continue to present a danger to the public as she did not engage in sexual contact, has been successful on pretrial release, pled guilty and accepted

responsibility, testified truthfully against Mr. Lazzaro, and addressed her chemical and

mental health.

If this Court disagrees with Ms. Castro Medina's position regarding this

enhancement, then she asks for a 5-level departure or a variance. As stated in the PSR:

> [T]his officer would also acknowledge criticism of the enhancement under
> USSG §4B1.5, Repeat and Dangerous Sex Offender Against Minors, which
> is commonly seen as not assisting in differentiating severity of conduct
> between different defendants. As Castro Medina already received a 4-level
> increase for the number of victims in this case, the additional 5-level
> enhancement that also accounts for multiple victims or occasions may be
> seen as excessive, even if not technically an impermissible application. A
> variance to the range without this enhancement would result in consideration
> of a range that starts at 210 months, and this may be a more appropriate
> starting point to further consider the goals of sentencing, to include Castro
> Medina's personal history and characteristics that appear to warrant
> significant weight.

(ECF No. 422, ¶ 165).

### C. Undue Influence

The plea agreement left the issue of a 2-level increase for undue influence

pursuant to U.S.S.G. § 2G1.3(b)(2)(B) open to argument. The application notes state:

> In determining whether subsection (b)(2)(B) applies, the court should closely
> consider the facts of the case to determine whether a participant's influence
> over the minor compromised the voluntariness of the minor's behavior. The
> voluntariness of the minor's behavior may be compromised without
> prohibited sexual conduct occurring.

Ms. Castro Medina maintains her position that she did not unduly influence

anyone, with which the PSR agrees (ECF No. 422, ¶ 145). Ms. Castro Medina's trial

testimony does not support a finding of undue influence:

> Q.     . . . If someone wasn't interested, would you push it?
> A.     I don't think so.

Q.    Why not?
A.    Because I knew they weren't going to do it.
Q.    Was it easier just to move on?
A.    Yes, it was easier to move on. (T. 418)
. . .
Q.    What is this an example of?
A.    Me trying to recruit her.
Q.    And was she interested?
A.    No, she was not.
Q.    So did you drop it?
A.    I dropped it. (T. 420)
. . .
Q.    So if you got a response like that, what would you do?
A.    Drop it. Change the conversation. (T. 421)
. . .
Q.    You didn't pressure anybody?
A.    I don't think I did.
Q.    You didn't push anybody?
A.    I don't think I did.
Q.    You didn't have control over any of these people, did you?
A.    No, but I influenced them.
Q.    But you didn't have control over them?
A.    I didn't have control over them.
Q.    You made introductions, true?
A.    True. (T. 481)

Thus, Ms. Castro Medina did not unduly influence anyone.

## II.   Downward Departure

While not a recommendation, the PSR identified the following factors in

consideration of a downward departure:

> This officer would note that Castro Medina is subject to the same base
> offense level for sex trafficking as her codefendant, even as Lazzaro
> engaged in sexual contact with the victims. Castro Medina's role as a
> recruiter of victims that were arguably in her peer group after she had also
> engaged in commercial sex with Lazzaro and was just four months past
> being considered a victim herself . . . is a circumstance not accounted for in
> the offense level computation and that could be considered under this
> provision.

27

(ECF No. 422, ¶ 160).  Ms. Castro Medina's role was differentiated during her trial

testimony when the questioning prosecutor threw Ms. Castro Medina a lifeline:

> Q.   You've told us you did some terrible things in this case, right?
> A.   Yes.
> Q.   Understanding that you did terrible things, were you the one who gave alcohol to 15- and 16-year-old girls, the victims?
> A.   Sometimes.
> Q.   These victims?
> A.   Sometimes. With [Victim C].
> Q.   That's fair.  **Were you the one who gave them alcohol and then paid them for sex?**
> A.   **No.**
> Q.   **Were you the one who had sex with those girls?**
> A.   **No.**
> Q.   **Okay. Just to put it in perspective.** (T. 514–15, emphasis added)

To equate Ms. Castro Medina's conduct with Mr. Lazzaro's conduct under the Sentencing

Guidelines does not accurately reflect her actions in this case.  Thus, a downward

departure is appropriate.

## III.   Ms. Castro Medina's 3553(a) Factors Warrant a Sentence of Time Served and Supervised Release

To begin, as stated above, the PSR notes an issue for a variance with a potential

starting point of 210 months, rather than life due to the excessive enhancement under

Chapter 4 (ECF No. 422, ¶ 165).

### A.  The Nature of the Offense

Ms. Castro Medina does not dispute that her actions in this case were terrible.  In

fact, in her testimony, she stated, "I think it's disgusting and I think it's horrible, and I

think it should have never happened" (T. 334).  Ms. Castro Medina feels awful for what

she did, and she will have to live the rest of her life knowing that she was a participant in sex trafficking.

Ms. Castro Medina's role in the offense, however, is only one part of the nature of the offense.  But for her history, it is unlikely that she would have ended up here today.  As stated in the PSR:

> Castro Medina described an upbringing in which her parents' primary interaction with her was either abusive or neglectful. They showed little to no investment or involvement in her success, first as she navigated high school activities and events and later when she applied and was accepted into college. This has been corroborated by their lack of presence at any of her court appearances nor to support her as she testified in a high-profile trial that was covered by national news outlets. Her support network remains so limited that her current college and former high school boyfriends, therapist, and Pretrial Services officer were seen as the only viable collateral contacts. Her experience as a minor is seen as highly relevant to sentencing, as the instant offense began only four months after she turned age 18 and while she was still attending high school. While technically an adult for the purposes of charging and sentencing, she was relationally in a peer group of minors and would be seen by most individuals as akin to a minor until her high school graduation. Just as that was occurring, Castro Medina began a strangely-defined relationship with codefendant Lazzaro, one that started with commercial sex between them and continued with Castro Medina finding additional minor females to engage in these acts with him. She received significant financial offerings from Lazzaro for her efforts but also described relying on him for all manner of support as she navigated an abusive relationship and the beginning of her college attendance. Castro Medina drank heavily and abused prescription drugs throughout the conspiracy, and this and her contact with Lazzaro continued, even as rumors of an investigation began and then after search warrants were executed in December 2020. Castro Medina then engaged in obstructive conduct at Lazzaro's direction, with their contact (and his monetary payments to her) ceasing only after they were both arrested and detained in August 2021.

(ECF No. 422, ¶ 162).

"[N]umerous studies have shown that girls who witness domestic violence while growing up are at much higher risk of ending up in violent relationships themselves."

BESSEL VAN DER KOLK, M.D., THE BODY KEEPS THE SCORE 148–49 (Penguin Books 2015).  Ms. Castro Medina's background made her a prime target for Mr. Lazzaro, and there is no doubt that the victims in this case are victims because of Ms. Castro Medina.  But if Ms. Castro Medina had not become Mr. Lazzaro's recruiter, it is very likely that he would have found someone else and then other girls would have fell victim to him.

Another important aspect of the nature of this offense is Ms. Castro Medina's choice to cooperate with the government and testify against Mr. Lazzaro.  She met with the government, confessed to her conduct repeatedly, had to relive her trauma and her actions, and then she testified truthfully for a whole day.  Ms. Castro Medina's testimony was noted by the press on Twitter:



The nature of the offense, too, blurred Ms. Castro Medina's role between defendant and victim.  As stated in the attached letter by A.P.:

> Traffickers also know how to identify victims. In my years working with survivors, a common demographic emerged. First, more than 85% of my clients are young women and girls of color who have experienced prior childhood abuse, sexual assault and domestic violence. Sadly, Gisela has also experienced a childhood of parental abuse and bullying in her school and community because of her ethnic minority status. She has been diagnosed with posttraumatic stress disorder (PTSD) as a result of her severe childhood abuse, neglect, racial discrimination, bullying by peers and both adult and childhood sexual exploitation and ultimately sex trafficking.

Mr. Lazzaro began by gaining Ms. Castro Medina's trust and then had sex with her on two occasions when she was too intoxicated to say "no."  After she agreed to be his recruiter, he directed her to the type of girl he wanted and began controlling every aspect of her life, including providing alcohol and Adderall.  Ms. Castro Medina agrees that she was a willing participant, but she was also a young, naïve girl with a traumatic past who had finally found an older man who took care of her.  As stated by the CEO of The Link, which is a non-profit in Minneapolis that helps youth and young families struggling with homelessness, sex trafficking, and more:[4]



Beth Holger · 2nd
**+ Follow**   •••
Chief Executive Officer
4mo · Edited · 🌐

I got a text last Thursday from one of Lazzaro's many victim-survivors that said "GUILTY ON ALL COUNTS"! I / we are so grateful to see justice being served in this case and are hopeful he will no longer be able to hurt anyone else. Very thankful first and foremost to all of the incredibly brave youth that came forward-something that is incredibly hard and literally life threatening for trafficking victims to do....also very thankful for the bravery of Gisela-although she is being depicted as a criminal in the media we know that she is also a victim of Lazzaro-sex traffickers typically do use/manipulate/threaten youth to be peer recruiters and to do a lot of the "dirty work" for them. Although she did do some of the things said in the media she was recruited and manipulated into it by Lazzaro and am hoping that at sentencing they will take the considerations of how sex traffickers operate into consideration.

Also a huge thank you to Officer Bruegger with MPD and the BCA Trafficking Taskforce, Special Agent Winston and his team at the Minneapolis FBI and US Asst. Attorney Laura Provinzino who I heard from victims in this case was very kind and thoughtful to them through the trial!

Now hopefully the healing from the harm Lazzaro did can begin...

---

[4] LinkedIn.com, Profile of Beth Holger Ambrose, https://www.linkedin.com/in/beth-holger-ambrose/recent-activity/all/ (last visited Aug. 22, 2023).

### B.  Ms. Castro Medina's Characteristics

By all accounts, Ms. Castro Medina is a kind, thoughtful, strong, very intelligent young woman.  She has grown up extremely quickly since the search warrants were executed in this case.  She lacks support from her family and leans on her therapist, advocates, AA sponsor, boyfriend, and counsel.  Since her release from custody in September 2021, she has bravely worked through her traumatic past, both from childhood and adulthood.  She has formed a strong, trusting relationship with her therapist so that she has been able to address and confront her past trauma.  She has been able to put words to her trauma and her feelings surrounding it.  For a 21-year-old, this is not a small feat.  "Traumatic experiences are often lost in time and concealed by shame, secrecy, and social taboo."  THE BODY KEEPS THE SCORE 148.  "People cannot put traumatic events behind until they are able to acknowledge what has happened and start to recognize the invisible demons they're struggling with."  THE BODY KEEPS THE SCORE 221.

Ms. Castro Medina's road has not been easy.  In childhood and adulthood, she has self-harmed and tried to take her own life.  "The more isolated and unprotected a person feels, the more death will feel like the only escape."  THE BODY KEEPS THE SCORE 148. However, entering her guilty plea with a detailed factual basis, testifying against Mr. Lazzaro, and earning more freedom on pretrial release has allowed her to become stronger and less isolated.  She has, and will always be, a trauma survivor, but she is learning to live with it and find her place in society.

> Every trauma survivor I've met is resilient in his or her own way, and every one of their stories inspires awe at how people cope.  Knowing how much energy the sheer act of survival requires keeps me from being surprised at

the price they often pay: the absence of a loving relationship with their own bodies, minds, and souls.

THE BODY KEEPS THE SCORE 281.

Her childhood traumas alone have left her vulnerable.  "Adverse Childhood Experiences (ACEs) are adversities children face in their home environment which include various forms of physical and emotional abuse; neglect; and household dysfunction during childhood (birth to age 17)" (ECF No. 422, ¶ 120).  Ms. Castro Medina scored 8 out of 10 on the Adverse Childhood Experience (ACE) Questionnaire (ECF No. 422, ¶ 121).  Individuals with higher ACE scores are more likely to have "higher workplace absenteeism, financial problems, and lower life-time income," chronic depression in adulthood, be on antidepressant medication or painkillers, have suicide attempts, be alcoholics, be raped in adulthood, and more.  THE BODY KEEPS THE SCORE 148–49.  "The ACE study showed how early abuse devastates health and social functioning."  THE BODY KEEPS THE SCORE 349.

There is no doubt that Ms. Castro Medina has grown and evolved since her arrest in August 2021.  She went from a loyal follower of Mr. Lazzaro's to an independent and confident young woman, though it has been a bumpy and difficult road.  As stated in the PSR:

> However, Castro Medina has displayed a remarkable transformation not just since her release from custody, but even since this officer first met her in December 2021. Early records from her pretrial release describe her as ambivalent at times or not recognizing the magnitude of her circumstances, but her recognition of the severity of her conduct has seemed to increase as she works through the experiences and mental health issues that contributed to her participation. The Court observed the culmination of her growth in her trial testimony, during which she fully admitted her conduct, acknowledged

33

her disappointment in her own behavior, and credibly testified regarding the criminal actions of Lazzaro. This is a stark change from the young woman who continued to accept money, reassurance, and direction from Lazzaro until physically prevented from doing so by each of their federal arrests.

(ECF No. 422, ¶ 163).

To this officer, Castro Medina's involvement with Lazzaro is contextualized by her lack of any supportive relationships as she came of age. Her new-found freedom being outside of her parents' abusive and domineering (yet emotionally devoid) household was exploited to criminal purposes by Lazzaro when she also found herself in need of all manner of support. Of greatest concern to this officer is the level of what intervention was required before she recognized the gravity of her behavior. Despite multiple signals, her arrest and initial prolonged period of pretrial detention were the only effective measure that severed her destructive relationship with Lazzaro. However, since that time, albeit slowly at first, she appears to have untangled the web of relational, mental health, substance abuse, and financial dynamics that made her susceptible to such poor judgment and truly egregious offense behavior. The length of her criminal conduct and her slow recognition of it as criminal is an aggravating factor; perhaps, it is also an explanatory one that displays most aptly how completely corrupted her worldview had become and why it took so long to reform.

(ECF No. 422, ¶ 164).

Castro Medina has significantly benefitted from mental health and substance abuse treatment, both of which are seen as necessary to support her continued success. She does not appear to have any physical health concerns which warrant consideration in the determination of her sentence. However, her mental health treatment is specialized, and consideration of her current progress may inform the timing of her sentencing, if voluntary surrender should be considered, and when it might occur if an imprisonment sentence is imposed.

(ECF No. 422, ¶ 166).

Though Ms. Castro Medina is only 21 years old, she has exhibited a life change rarely seen in much older adults.  Granted, most people do not have the traumatic past that she has, but she has taken that past and used it to shape her future.  She uses her past

34

to speak out against sex trafficking, to help others in similar situations, and to educate others who do not know what sex trafficking entails.  B.H. writes in the attached letter:

> Gisela took the initiative to reach out to me because she wanted to find a way to give back and volunteer with an organization that works with victims of sex trafficking . . . .

> She has taken accountability for her actions and is very remorseful for them, however, I strongly believe that her actions were a direct result of being a victim of Tony Lazzaro herself and had she not been under his abuse and manipulation, she would have never done the things that she did.

> I have seen her take accountability for her actions, be remorseful, work hard on her own healing and mental health through therapy, work on her education and give back to her community and other victims of sexual exploitation by volunteering with us . . . .

Attached is an article dated March 8, 2022 written by Ms. Castro Medina, though it does not list her name, followed by a response to the article by one of her professors, M.P.  Ms. Castro Medina also gave a verbal report in one of her classes about the changes to the voting law in Minnesota, and attached is a response from a classmate, M.M.  Also attached is a short essay Ms. Castro Medina wrote in high school showing that she has spent a lot of time reflecting on her life and life in general, the changes in her short life, and destiny.  She is a smart, capable, driven young woman despite her past.

### C. Deterrence

While there is no doubt that a prison sentence would deter Ms. Castro Medina from committing crimes in the future, it is not necessary here as she has already been, and will continue to be, deterred in other ways.  First, at 19 years of age, Ms. Castro Medina had no substantial criminal history but was facing a federal felony indictment of sex

trafficking and was housed in many jails during her five-week transport from Florida to Minnesota.

Regarding federal prison, Ms. Castro Medina is certainly an outlier.  In the Federal Bureau of Prisons, 6.9% of inmates are female,[5] 12.2% of inmates are serving time for sex offenses,[6] 29.8% of inmates are Hispanic,[7] and 0.9% of inmates are ages 18–21 while 4.7% of inmates are ages 22–25.[8]  Ms. Castro Medina, a 21-year-old Hispanic female convicted of a sex offense, would be in one of the smallest of demographics in the BOP.

Next, Ms. Castro Medina has been on pretrial release for almost two years.  She went from a controlling household as a minor to Mr. Lazzaro, who controlled her every move and thought, to federal custody, to a pretrial release officer.  Ms. Castro Medina has never once been free in her life.  While she now feels freer than she ever has been, that is more due to her therapy, treatment, and education.

There are other deterrents as well.  "The stigma of a felony conviction is permanent and pervasive."  *United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982).  Both a felony conviction and sex offender registration will affect Ms. Castro Medina in obtaining housing, getting a job, volunteering, and so on.  "Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called

---

[5] Federal Bureau of Prisons, Inmate Statistics, Inmate Gender,
https://www.bop.gov/about/statistics/statistics_inmate_gender.jsp (last visited Aug. 22, 2023).
[6] Federal Bureau of Prisons, Inmate Statistics, Offenses,
https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp (last visited Aug. 22, 2023).
[7] Federal Bureau of Prisons, Inmate Statistics, Inmate Ethnicity,
https://www.bop.gov/about/statistics/statistics_inmate_ethnicity.jsp (last visited Aug. 22, 2023).
[8] Federal Bureau of Prisons, Inmate Statistics, Inmate Age,
https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last visited Aug. 22, 2023).

to account, as these men are, for the wrong that they committed." *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012).

### D.  Seriousness of the Offense, Respect for the Law, Just Punishment

As stated above, Ms. Castro Medina does not dispute the seriousness of the offense, the harm to the victims, or her role in the conspiracy; this is all detailed in the trial testimony.  Her actions and choices since her arrest, however, show her respect for the law.  She followed all of her pretrial release conditions, earning more and more freedom as time progressed.  She completed treatment.  She is a consistent member of AA.  She is in therapy.  She is working.  She is volunteering.  Perhaps most importantly, she decided to cooperate with the government and testify against Mr. Lazzaro.  Despite his attempts, once she broke free from him, she did not let his bullying keep her from doing what she knew was the right thing.  She met with the government, discussed her wrongdoings, and confessed repeatedly.  It is difficult to say that her meetings with the government, testifying, and even talking to the undersigned were not re-traumatizing.  Still, she knew this was the way to completely break free from Mr. Lazzaro and validate the victims' truths.  In their PSR objections, the government noted that Ms. "Castro Medina proved credible time and again" (ECF No. 410, p. 4).

Ms. Castro Medina has also shown immense respect for the law by accepting full responsibility.  N.S. writes in the attached support letter:

> Gisela pled guilty, has accepted responsibility and expresses deep regret to me at least once a week. She struggles with the consequences of it on an emotional level every day of her life, but she continues to persevere and be a great example to other young women in recovery who are struggling with their substance abuse issues. Gisela also shares her experience, strength and

hope with other women who have been sex trafficked and wants to make an impact on society as an advocate for those victims who sorely lack voices in our world today. . . . [H]er potential and desire to be a voice and presence as an advocate for so many women gives her the potential to make a very positive impact. As a victim of sexual abuse myself, I can honestly say a huge barrier is the idea that nobody understands. It leads to a total feeling of isolation and hopelessness. Gisela is a person who can provide that understanding and give others hope who so sorely need it. I therefore advocate for her receiving probation or some sentence other than prison/jail time. In a world with so many hopeless female victims, it would be a shame to deprive them of a voice and an example of hope they sorely need[.]

Ms. Castro Medina's AA sponsor, C.F., writes:

I have watched Gisela as she committed to staying sober through a difficult time, as she prepared for her guilty plea and her testimony at Tony Lazarro's trial. She accepts her responsibility in this situation . . . . As I learned about her life experiences and early childhood trauma, I've also come to understand how a teenager with her background, naiveté, and hunger for affection could end up in this situation. She has expressed deep regret for her actions. . . . She has used her experiences to try to help other alcoholics, as well as other sex-trafficked women. . . . At the same time, she has endured the publicity and shaming from the hearings and trials, losing several jobs because of it.

G.S., one of Ms. Castro Medina's college professors, writes:

Gisela was honest and upfront concerning her situation in Federal Court. I know that she pled guilty to the charges and was testifying in court as she missed class to do so. Gisela never tried to downplay her role in the crimes she was charged with and clearly regretted her immaturity and culpability in the decisions she made that brought other young people into a dangerous and vulnerable position. . . . I did witness her grappling with the reasons she made the poor decisions she did, accepting responsibility for her actions, and working to improve her stability in life. . . . . Gisela is an intelligent young woman and was a valuable member in group discussions sharing both her research and her personal perspectives.

I.M., one of Ms. Castro Medina's friends, writes:

I want to say that I know that Gisela has improved greatly as a human being along this path. Now she is not only a survivor, but an advocate with a voice that I and other women value so much. A voice that has reached other countries, other continents, and has come to teach.

M.J-W., another one of Ms. Castro Medina's college professors, writes:

> Gisela spoke candidly about her role when asked by classmates.  She
> admitted that she had become a willing participant and that her actions had
> caused harm to others. . . . Gisela is a bright, hard-working young woman,
> who appears genuinely remorseful.  She wants a different kind of life for
> herself in the future, and her intellect and access to education are likely to
> make that possible.  She might even point other troubled, young women into
> the right direction in an appropriate community services setting.

Finally, Ms. Castro Medina's boyfriend, S.C., writes:

> I'm aware of Gisela's current situation in court, that she has pled guilty as
> well as her acceptance of full responsibility for the crimes with which she is
> charged. It is my belief that her acceptance of full responsibility does not
> even begin to portray how truly remorseful she is for her involvement in the
> aforementioned crimes. Rather than wallow in self-pity since her
> incarceration, Gisela has taken every available opportunity to act as an
> advocate for vulnerable women, especially those who have been victimized
> by sex trafficking. She has not sat on her hands rather she has been a part of
> truly impressive work with [various organizations]. This work has scored her
> an audience of advocates ranging from leaders of non-profits to advisors to
> the White House. These feats are truly impressive and worthy of much praise
> and honor, but those accomplishments are far from the only parts of Gisela
> that I'm most proud of.
> . . .
> From [the date of her arrest] ever since, not a single drop of alcohol nor dose
> of Adderall has entered Gisela's body. From that day forward as well, she
> ceased to have contact of any kind with Tony. While the initial effects of this
> abrupt change to her life were difficult and in many ways traumatizing, the
> overall effect has been incredibly beneficial. In the aftermath of her
> incarceration, Gisela has been able to clear her head, process the trauma that
> she's endured and come to terms with the activity that she was a part of.
> Through intensive therapy, Gisela's recovery from trauma has allowed her to
> not only maintain absolute sobriety but also to improve her own mental
> health in ways that previously seemed impossible.
> . . .
> She is a truly reformed person, whose life experiences and current ambitions
> serve only to benefit not only the people directly around her but also society
> as a whole. I am advocating for her to receive a sentence of no prison time
> motivated by not only my immense love for her as a person but also my
> steadfast belief that Gisela is one of the most powerful forces for good that I

know, and to sentence her to any time in prison would only serve to stifle that awe inspiring positive momentum that I've been lucky enough to be a firsthand witness to.

### E.  Protect the Public from Further Crimes of Ms. Castro Medina

The likelihood that Ms. Castro Medina "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper*, 562 U.S. at 492.  As stated in Ms. Castro Medina's therapist's letter and the support letters attached, no one expects Ms. Castro Medina to reoffend.  She has come to see the true reality that was her life and the harm she caused to the victims.  A term of supervised release where Ms. Castro Medina can continue with therapy, AA, college, volunteering, and work is much more likely to ensure that she remains law-abiding than a prison sentence, which would very likely harm her mental health and push her backwards.  As stated by V.G. in her attached support letter, Ms. Castro Medina "deeply regrets her actions and I feel confident that she would never make such a poor decision again."

### F.  Provide Ms. Castro Medina with Educational Training, Medical Care, or Other Correctional Treatment

Ms. Castro Medina has done exceptionally well on pretrial release for nearly two years.  She has shown that she can abide by conditions set by the Court, successfully complete treatment, maintain her sobriety, work, volunteer, and further her education.  While she does not have much of a relationship with her parents, she has a very good relationship with her younger sister and her boyfriend.  She has surrounded herself with a support system, which includes her boyfriend, therapist, advocates, and AA sponsor.  Imposing a prison sentence will set her back considerably in the great strides she has

been making.  A term of supervised release will allow Ms. Castro Medina to continue advancing her education, maintain her sobriety, volunteer, and grow her relationships.

> People who feel safe and meaningfully connected with others have little reason to squander their lives doing drugs or staring numbly at television; they don't feel compelled to stuff themselves with carbohydrates or assault their fellow human beings.  However, if nothing they do seems to make a difference, they feel trapped and become susceptible to the lure of pills, gang leaders, extremist religions, or violent political movements—anybody and anything that promises relief.  As the ACE study has shown, child abuse and neglect is the single most preventable cause of mental illness, the single most common cause of drug and alcohol abuse, and a significant contributor to leading causes of death such as diabetes, heart disease, cancer, stroke, and suicide.

THE BODY KEEPS THE SCORE 353.

Prison is not needed to reform Ms. Castro Medina.  Pretrial release and her own drive and desires have reformed her.  She is a motivated young woman who has been through more than most adults, including being housed in various jails for five weeks while she was transported from Florida to Minnesota.  Rather than feel a victim of the justice system, she has embraced her experiences and used them to assist others.  As stated in the attached letter from A.P.:

> Gisela is also an emerging young advocate. In September 2022, with the approval of her legal counsel and probation officer, she joined 20 young women in Los Angeles to help create a global survivor movement addressing online sexual exploitation and abuse. Gisela worked alongside advocates from across Europe, Australia and Mexico in a three day summit where she shared personal experiences and informed a global action plan to stop these forms of gender-based abuse. Despite the trauma and stress of her own legal situation coupled with PTSD, she remained very engaged and focused and never missed a session. She is a strong advocate and we are so grateful for her engagement and wisdom.

> I am confident that Gisela has a bright future ahead of her. She deserves a chance to reach her dreams and give back to the world.

Ms. Castro Medina has built strong relationships and will continue to do well.  "As long as we feel safely held in the hearts and minds of the people who love us, we will climb mountains and cross deserts and stay up all night to finish projects.  Children and adults will do anything for people they trust and whose opinion they value."  THE BODY KEEPS THE SCORE 352.  Ms. Castro Medina will not let this Court down.

### G. Sentences Available

"It may *very often* be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrer or punitive purpose." *United States v. Edwards*, 595 F.3d 1004, 1016, n.9 (9th Cir. 2010) (citation omitted). While probation is not an option in this case, there is also no mandatory minimum.  Thus, this Court can give Ms. Castro Medina credit for time already served in custody and place her on supervised release.  Any terms of supervised release will be onerous and will certainly be a sufficient punishment for Ms. Castro Medina.

Ms. Castro Medina has shown what successful rehabilitation by pretrial release services looks like.  If given the opportunity, she will show this Court how successful she can be on supervised release.

## IV.   Restitution

In fulfillment of her plea agreement, on August 8, 2023, Ms. Castro Medina turned in her Mini Cooper to the government, leaving her with next to no assets in addition to her lack of monthly cash flow (ECF No. 422, ¶ 138).  Ms. Castro Medina desperately wants to make the victims as whole as she can, and the best thing she can do to make that

happen is to continue going to school and working.  Ms. Castro Medina's $20,000 currently in the undersigned's trust account will be turned over to the Court and will go directly to the Justice for Victims of Trafficking Act totaling $10,000, special assessments totaling $200, fines/fees, and restitution.

Currently, restitution is being requested in the total amount of $760,475.39.  Ms. Castro Medina does not dispute that restitution is appropriate, but she objects to one of the victims' requests for $690,000 in restitution.[9]  While Ms. Castro Medina does not dispute the trauma that victim has incurred, this amount is not reasonable for projected restitution in this case.  While restitution may include a victim's costs "that are reasonably projected to be incurred in the future," 18 U.S.C. § 2259(c)(2), this is not a continuing offense, such as child pornography, where images or videos are irretrievable from the public and so continuously appear and disrupt the victim's life.

In *United States v. Osman*, the defendant sexually abused and molested his 1-year-old daughter six separate times over nine months and then photographed the abuse and distributed the photos.  853 F.3d 1184, 1185 (11th Cir. 2017).  The district court ordered restitution in the amount of $16,250 based on future projected therapy expenses.  *Id.* at 1188.  At the restitution hearing, a licensed counselor testified that the victim would likely need treatment at four different stages in her life: six months of Eye Movement Desensitization and Reprocessing (EMDR) treatment, six to nine months of therapy around second grade when the victim would start to realize her family was not like other

---

[9] If this Court schedules a restitution hearing or briefing schedule on restitution for Mr. Lazzaro's case, Ms. Castro Medina requests to join.

families and start to have emotional and behavioral disturbances, nine to twelve months of therapy in adolescence when she reaches puberty and starts understanding sexual relationships and what happened to her, and then six months of therapy in adulthood when she is close to marriage or parenthood.  *Id.* at 1186–87.  In affirming the district court's grant of restitution for expected therapy expenses, the Court of Appeals stated:

> We are not dealing here with just the likelihood that a young child whose pornographic images are shared online will suffer residual effects from the reproduction of those images will need treatment. We are dealing with a child who was molested by her father, who will be informed of that fact, who will know that her father is absent from her life and suffering imprisonment based on that interaction. That is a heavy burden to place on a child. We cannot imagine that therapy will not be in order at the relevant times. Given the facts here, it seems that the need for future therapy is not just likely, but a virtual certainty.

*Id.* at 1192.

The victim's request for restitution for projected expenses, even if she is in therapy for 50 years (well into her 60s), does not take into account the possibility (more likely, the probability) of her switching therapists with different rates, insurance coverage of therapy sessions, other life incidents that necessitate therapy, and so on.  It also presupposes that the victim will simply not improve, which is an extremely dismal prospect, as it is expected that therapy will help overcome one's trauma.

Without the $690,000 in projected expenses for that victim, restitution then totals $70,475.39.

## **CONCLUSION**

For the foregoing reasons, Ms. Castro Medina respectfully requests that this Court sentence her to credit for time already served and a period of supervised release.  If this Court imposes prison time, Ms. Castro Medina respectfully requests a voluntary surrender with a delayed turn-in date.

Respectfully submitted,

**RYAN GARRY, ATTORNEY, LLC**

Dated:  August 22, 2023          s/ Elizabeth Duel

Ryan P. Garry (Attorney No. 0336129)
Elizabeth R. Duel (Attorney No. 0393619)
Attorneys for Defendant
333 South Seventh Street, Suite 3020
Minneapolis, MN 55402
Phone: (612) 436-3051
Fax: (612) 436-3052
ryan@ryangarry.com | elizabeth@ryangarry.com